2018 IL App (1st) 171773

FIRST DISTRICT
FIRST DIVISION
September 28, 2018
Rehearing denied March 29, 2019

No. 1-17-1773

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01-CR-17492 |
| | ) | |
| KEVIN JACKSON, | ) | Honorable |
| | ) | Evelyn B. Clay, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Harris concurred in the judgment and opinion.
PRESIDING JUSTICE MIKVA also dissented upon denial of rehearing, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Kevin Jackson was convicted of first degree murder and aggravated battery with a firearm, convictions this court affirmed on direct appeal. The State's case rested on the prior inconsistent statements of three eyewitnesses. By the time of trial, each of those witnesses had recanted, telling the jury that their previous statements identifying Mr. Jackson as the shooter were the result of police coercion. Mr. Jackson now appeals from the denial of his motion seeking leave to file a successive postconviction petition, which is supported by documents he contends establish a pattern and practice of misconduct by the group of detectives responsible for the investigation that led to his trial and conviction. Mr. Jackson

argues that the circuit court incorrectly determined that this new evidence of a pattern and practice of police misconduct was insufficient to establish either a freestanding claim of actual innocence or to make the threshold showing of cause and prejudice otherwise necessary to file a successive petition. He asks us to reverse the circuit court's order and to remand this matter either for a second-stage hearing, to determine if there is a substantial basis for his claimed constitutional violations, or for a third-stage evidentiary hearing, on the basis that he has already made such a showing.

¶ 2    For the reasons that follow, we affirm the circuit court's order denying Mr. Jackson leave to file his successive petition. The new evidence that Mr. Jackson presents does not support a freestanding claim of actual innocence. And although we are mindful of the difficulties faced by defendants seeking to uncover and document police misconduct, we are unable to conclude that Mr. Jackson has met the high bar here of showing both cause and prejudice. The documentation offered in support of his motion—which we have scrutinized with care—fails to draw sufficient connections between the specific acts of police coercion alleged in this case and a pattern and practice of similar misconduct by the same officers.

¶ 3                                  I. BACKGROUND

¶ 4    At approximately 1:30 a.m. on May 6, 2001, Ernest Jenkins drove his car to a Citgo gas station on the corner of Damen Avenue and 55th Street in Chicago. The car's passengers— Michael Watson and Michael's nephew, Stanley "Meechie" Watson—exited the vehicle to pump and pay for gas. Shots rang out, and Michael and Mr. Jenkins were both struck. Michael survived, but Mr. Jenkins died of his injuries later that same day. Following a police investigation, Mr. Jackson was arrested on June 19, 2001. In July 2001 he was indicted by a grand jury on multiple counts, including first degree murder and aggravated battery with a

firearm.

¶ 5    The evidence presented at trial was summarized in this court's order affirming Mr. Jackson's convictions on direct appeal (*People v. Jackson*, 364 Ill. App. 3d 1050 (2006) (table) (unpublished order under Supreme Court Rule 23), and that summary has been largely adopted by both the circuit court in its postconviction orders and the State in this appeal. However, we have restated many of the facts here because we believe that some of the details that are omitted from that Rule 23 order are relevant to showing how close the evidence was at trial.

¶ 6                              A. Evidence Presented at Trial

¶ 7    At trial, the State's theory of the case was that the shooting was a turf dispute involving members of rival gangs. According to the State, Mr. Jackson, known in the neighborhood as "Googie" or "Googy," was a Vice Lord who shot at Meechie Watson, a Gangster Disciple, because the gas station Meechie stopped at was in Vice Lord territory and because, while at the gas station, Meechie talked to Mr. Jackson's girlfriend, Quiana (sometimes referred to as Quina) Davis. Although Meechie escaped unharmed, Michael Watson and Ernest Jenkins, finding themselves between Mr. Jackson and his target, were both shot, and Mr. Jenkins was killed.

¶ 8    To support its theory, the State relied on the signed statements of four eyewitnesses— Brandy Butler (also known as Brandy Grant or Brandi Grant), Vernon Clay, Manuel "Manny" Stewart, and Shemika Mason—which were admitted into evidence pursuant to section 115-0.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2000)). That section of the Code provides that prior inconsistent statements are substantively admissible if the witness is subject to cross-examination at trial and the statements were made from personal knowledge and were written or signed by the witness. In their statements, each of these witnesses identified Mr. Jackson as the shooter and indicated that he or she was treated well by the police

and not promised anything in exchange for signing a statement. Three of the witnesses—Ms. Butler, Mr. Clay, and Mr. Stewart—also testified before a grand jury, where they confirmed the accuracy and truthfulness of their signed statements.

¶ 9     At trial, however, none of these witnesses identified Mr. Jackson as the shooter. They instead each testified that they had been threatened and coerced by detectives into signing the statements and giving the grand jury testimony implicating Mr. Jackson. No forensic evidence connected Mr. Jackson to the crime, and Michael Watson, the surviving victim and the only other eyewitness to the shooting who testified at trial, stated unequivocally that Mr. Jackson looked nothing like the man who shot him.

¶ 10     These prior statements, refuted on the stand by the witnesses who gave them, were the evidence of Mr. Jackson's guilt that was presented at trial. The trial testimony of each of the witnesses, and how it differed from their pretrial statements, is discussed below.

¶ 11                         1. The Recanting Witnesses

¶ 12                          a. Brandy Butler

¶ 13     In her signed pretrial statement given to the police and Assistant State's Attorney (ASA) Colleen Daly and in her grand jury testimony, Ms. Butler stated that on May 6, 2001, Manny Stewart drove her, Mr. Jackson, Quiana Davis, and Mario Brown to the Citgo gas station in a car Mr. Stewart and Mr. Jackson owned together. As Ms. Butler exited the vehicle, she saw Meechie Watson, who called out to her and Ms. Davis. Ms. Butler continued into the gas station to make a purchase and, while inside, heard four or five gunshots, looked out the window, and saw Mr. Jackson, a member of the Vice Lords, firing a gun in the direction of Meechie, a Gangster Disciple. Ms. Butler said she then got down on the floor and did not see where anyone went.

¶ 14     At trial, however, Ms. Butler denied that Mr. Jackson was the shooter. She testified

4

instead that she had known Mr. Jackson for "[a] long time," that they had grown up in the same neighborhood, and that he was "nowhere around" at the time of the shooting. Ms. Butler testified that she arrived at the gas station with Mr. Stewart, Ms. Davis, and Mr. Brown and, as she was standing in line inside the gas station, she heard "ten or more" gunshots and "hit the ground."

¶ 15     Ms. Butler gave the following explanation for how she came to sign her statement identifying Mr. Jackson as the shooter:

"I just was ready to go because I was harassed. I was everything. I was three months pregnant. I was going through a lot. I'm stressed out still right now to this day 'cause I lied on him. They had me to lie on him. They told—they coerced me, Judge, I promise you. They made this story up. They kept saying Googie did it. He did not do it. He was nowhere around. And I'm not saying that for the simple fact, you know, that I'm scared of anybody. He didn't do it. He was nowhere around. He was not in the car with us. *** The detectives would not listen to me. They was not trying to hear anything. They told us that if we did not say who did that, that it would be crimes on us 'cause we was there that night at the gas station. And I was just ready to go. And I'm sorry for what I did and I just signed the statement on you because I was ready to go and they said we was gonna beat that case and I just did it because I have kids. I was there that night. I wish I wasn't there. It was a nightmare.

* * *

A.  And I'm suffering now for what I did.

(Witness crying.)

THE COURT: Do you want some water, Miss?

A.  No. Thank you, ma'am."

¶ 16                                    b. Vernon Clay

¶ 17    According to his signed pretrial statement given to Detective Brian Forberg and ASA Lisa Hennelly, Vernon Clay was also at the gas station at the time of the shooting and had walked, not driven, there with Ms. Butler and Ms. Mason. When they arrived, Mr. Clay said they saw Ms. Davis "jumping out of [Mr. Jackson's] car." He explained that Mr. Jackson and Ms. Davis were "fooling around but [we]re not boyfriend and girlfriend." Mr. Clay told police that he and Mr. Jackson were members of the Vice Lords, and at the gas station that night they saw Meechie, a Gangster Disciple, who "started talking to [Ms. Davis] about messing around." Mr. Clay said that he, Ms. Butler, Ms. Mason, Ms. Davis, and Meechie all went into the gas station, while Mr. Jackson and Mr. Stewart remained in their car. Meechie and Ms. Davis were still talking together when the group exited the gas station. It was then that Mr. Clay heard gunshots. He looked up and saw Mr. Jackson fire about eight shots into a parked car and Meechie running away. Mr. Jackson then ran from the scene.

¶ 18    Mr. Clay recounted a similar version of events in his grand jury testimony. Instead of saying that Ms. Davis was getting out of Mr. Jackson's car when Mr. Clay, Ms. Butler, and Ms. Mason arrived, however, he said that Ms. Davis had walked to the gas station with them. Mr. Stewart also said that Meechie loudly sexually propositioned Ms. Davis as the two were talking at the gas station and that the two of them "used to go together." Mr. Stewart said that, after exiting the gas station, he had "turned [his] back" and "walk[ed] across the park" when he heard the gunshots and ran. When asked if he ever looked back to see who was shooting, Mr. Stewart said he did and it was "Googi shooting at Meechie."

¶ 19    At trial, however, Mr. Clay insisted that he was not even present at the gas station for any

of these events. He testified that he was sleeping at home at the time of the shooting and did not know anything about it until he was given details by Detective Forberg at the police station. Mr. Clay explained that he only signed what the police claimed was his pretrial statement to the contrary after he was kept in a room at the police station for a whole day before anyone spoke to him and in custody for a total of three days. He claimed that the police threatened him with imprisonment, said it would "cost [him]" if he did not testify, and threatened to inform everyone on the street that he had cooperated with the police and identified Mr. Jackson as the shooter. At trial, Mr. Clay claimed he never actually gave a statement to Detective Forberg and ASA Hennelly, denied initialing a correction made to the third page of the statement, and denied signing the middle of the fifth page, though he admitted signing the bottom of each page of the statement. He further denied that it was his signature on the back of Mr. Jackson's photograph.

¶ 20    Mr. Clay also claimed that he never read what the police said was his statement, that he only signed it because he thought it was something he needed to sign to get his property returned to him, and that did not realize what he had signed until June 28, 2001, when officers drove him to the courthouse to testify before the grand jury. According to Mr. Clay, at that time they reminded him of "how many times [he] was convicted, how many cases [he] was fighting" and instructed him to say "yes" to every question or he "would never see the streets again." Mr. Clay denied telling Detective Forberg that he feared gang retaliation or that Mr. Jackson had warned him not to speak to the police.

¶ 21                                    c. Shemika Mason

¶ 22    Ms. Mason's signed pretrial statement, given to ASA Daly and read into the record at trial by Ms. Daly, identified "Kevin Johnson who was nicknamed Googi" as the shooter. This was apparently a transcription error, as everyone involved in this case has treated the statement

7

as referring to Mr. Jackson. Ms. Mason said in her statement that Mr. Stewart drove her, "Googi," Ms. Butler, and Ms. Davis to the Citgo gas station on the night of the shooting. Ms. Mason and Ms. Butler went into the gas station and Ms. Davis stayed outside, talking to a Gangster Disciple member named Meechie. Mr. Stewart and Googi remained seated in the front of the vehicle. Ms. Mason said that, when she left the gas station, Googi was standing near an alley with a gun in his hand, and she saw him fire in Meechie's direction four or five times. In her statement Ms. Mason also said that Googi later warned them not to talk to the police about what had happened.

¶ 23    At trial, however, Ms. Mason testified that she was not even at the gas station during the shooting. She denied telling police that she went there with Ms. Davis and Ms. Butler or that she saw Mr. Jackson at the gas station talking to Meechie. She further denied that, after the shooting, Mr. Jackson instructed her, Ms. Butler, and Ms. Davis not to talk to the police.

¶ 24    Ms. Mason testified that she was interrogated by the police all night before meeting with an assistant state's attorney who wrote out her statement, that the police were "telling [her] what they wanted [her] to say," that she "had a warrant at the time" and "was running from the police," and that they promised her that if she "went along with what they want[ed her] to say," they would "take care of [her outstanding] warrant." Ms. Mason told the jury she signed the statement simply because she did not want to go to jail. She denied telling the police either that she went to the Citgo gas station with Ms. Davis, Ms. Butler, Mr. Stewart, and Mr. Jackson to purchase cigars or that she saw Mr. Jackson there talking to Meechie. Ms. Mason also testified that she did not remember telling ASA Daly about Mr. Jackson's gang membership, about a conversation between Ms. Davis and Meechie at the gas station, or that she saw Mr. Jackson shoot in Meechie's direction. She also denied telling ASA Daly that Mr. Jackson later warned

Ms. Mason, Ms. Butler, and Ms. Davis not to talk to the police about what happened.

¶ 25    Ms. Mason was not called as a witness to testify before the grand jury.

¶ 26                                    d. Manuel Stewart

¶ 27    In his signed pretrial statement given to Detective John Clisham and ASA Hennelly, Manny Stewart, Mr. Jackson's cousin, stated that he and Mr. Jackson drove to the Citgo gas station together on the night of the shooting—in a car that the two of them owned together and had shared for "two years at the most"—with Ms. Davis, Ms. Butler, and Mr. Stewart's brother, Mr. Brown. Mr. Stewart stated that he and Mr. Jackson were both members of the Vice Lords and that, at the gas station, they saw Meechie, a member of the rival Gangster Disciples, talking to Ms. Davis. According to Mr. Stewart's statement, Mr. Jackson noticed Meechie just as Mr. Jackson was crossing the street to talk to a man named Ernie. Mr. Stewart said that other people were around and people were getting in and out of his car. After a couple of minutes, he heard a gunshot, turned around, and saw Mr. Jackson shooting into a parked car, at which point Mr. Stewart drove away from the gas station. Mr. Stewart gave a similar account implicating Mr. Jackson in the shooting to the grand jury.

¶ 28    At trial, Mr. Stewart denied this version of events, testifying instead that he was at the gas station with only Mr. Brown, Ms. Butler, and Ms. Davis. Mr. Stewart said that he saw Ms. Davis talking to Meechie, heard gunshots, and drove away from the gas station with Mr. Brown. Mr. Stewart testified that he saw the shooter as he drove away and that it was not Mr. Jackson but rather was an individual named Rick Party, whom Mr. Stewart had initially told the police was the shooter. Mr. Stewart agreed that he was taken somewhere to see a polygraph examiner but—following an objection by defense counsel to this line of questioning that was sustained by the circuit court—was prevented from providing any details about that encounter.

9

¶ 29    Mr. Stewart told the jury that he lied when he implicated Mr. Jackson, both in his statement and in his testimony before the grand jury. When asked why, Mr. Stewart explained:

" A. 'Cause they scared me. They said they was gonna lock me up for it or whatever.

Q. They said they were going to lock you up for the murder?

A. Yes, sir.

\* \* \*

A. 'Cause I thought they was gonna pin the murder on me and they really wanted me to put it on him, sir. They had already had two other statements that was signed with him saying he did it.

\* \* \*

\*\*\* I wasn't thinking about nobody else [*sic*] life, I was just thinking about myself."

¶ 30                                    2. Other Prosecution Witnesses

¶ 31    The State also called the surviving victim, Michael Watson, who testified unequivocally that Mr. Jackson was not the shooter. Michael testified that as he, Mr. Jenkins, and Meechie pulled into the Citgo gas station, he warned Meechie that they were in Vice Lord territory, but Meechie would not listen and headed toward the gas station to pay for the gas. When Michael exited the car to pump the gas, Meechie told him that a Vice Lord was coming their way. Michael testified that he looked up and saw his shooter from a distance of about 120 feet, describing him as a small, thin, African-American male, weighing around 120 pounds, whom Michael had never seen before. When asked if he recognized Mr. Jackson, Michael said, "I never seen that young man before" and he "don't look nothing like the guy 'cause the guy who shot

me, when I say black, I mean he's a black person, but he was dark, dark black."

¶ 32    In addition to these occurrence witnesses, the State called several of the officers and two of the assistant state's attorneys who worked on the case.

¶ 33    Detective Kevin Howley testified that when he interviewed Mr. Stewart, Mr. Stewart told him that he saw Mr. Jackson shoot the victims and that he had only previously implicated an individual named Rick Party to protect Mr. Jackson.

¶ 34    Forensic investigator Robert Tovar testified that he recovered six cartridge cases from near Mr. Jenkins's car and a fired bullet from the floor of the car. Dr. Adrienne Segova testified regarding Mr. Jenkins's cause of death: multiple gunshot wounds caused by bullets traveling from left to right through his body.

¶ 35    Detective Forberg testified that, after interviewing the surviving victim, Michael Watson, Detective Forberg and his partner, Detective John Foster, began looking for a car Michael had described to them—a "box-style Chevy with tan doors and primer painting" at the front and rear of the vehicle. Police found a car matching that description on May 18, 2001, 12 days after the shooting and approximately two blocks from where the shooting occurred. When they found the car it was occupied by Mr. Jackson and Mr. Brown. Michael Watson was brought in to view a photo array containing photos of both individuals but said that neither of them was the shooter. Michael did, however, identify a picture of the car that Mr. Jackson and Mr. Brown were found in as the vehicle he had described to police. He told them that he had seen the shooter sitting in the same car outside a liquor store approximately one month prior to the shooting. The photo of the car that police showed Michael was the same photo identified at trial by Mr. Stewart and Ms. Butler as the car that Mr. Stewart and Mr. Jackson shared, which Mr. Stewart used to drive himself, Ms. Davis, Ms. Butler, and Mr. Brown to the Citgo gas station on the night of the

shooting.

¶ 36     Most of the rest of the State's case was an attempt to convince the jury to believe the initial statements of the recanting witnesses, rather than their trial testimony. Detective Forberg recounted his interrogations of Mr. Clay and read Mr. Clay's statement into the record. According to Detective Forberg, Mr. Clay initially identified a fellow Vice Lord named Norman Mcintosh as the shooter but later changed his story, saying that Mr. Jackson was the shooter and had arrived at the gas station with Ms. Davis and Mr. Stewart.

¶ 37     Detective Forberg denied that Mr. Clay was forced to stay overnight at the police station and claimed that, instead, Mr. Clay had asked to stay there, telling the officers that he feared gang retaliation. Detective Forberg said, "I don't think he was happy about spending the night with us," but also that Mr. Clay never asked to leave because "[i]t was explained to him that the information that he conveyed to [the officers] needed to be checked out and he understood that [they] had to check out what he had told [them]."

¶ 38     Detective Clisham testified that, once he was informed of some things that Mr. Stewart had already told Detective Kevin Howley, he interrogated Mr. Stewart himself. Detective Clisham confirmed that what Mr. Stewart told him corresponded to Mr. Stewart's signed statement, which the detective then read into the record. When asked what happened next, Detective Clisham stated:

> "A. Um—Stewart was informed that he would be going to the—asked if
>
> he wanted to go to the Grand Jury the next morning. He stated that—um—he'd
>
> go. Basically, he wasn't too happy about it; but he said he'd stick around and go."

According to Detective Clisham, Mr. Stewart initially falsely identified the shooter to detectives as a member of the Vice Lords known as Rick Party in order to protect Mr. Jackson. However,

he later told Detective Clisham that Mr. Jackson was the shooter.

¶ 39    ASA Daly testified that, after meeting Detectives Foster and Forberg, she wrote out the statements of Ms. Mason and Ms. Butler. In each case, she first met alone with the witness to confirm that the witness had not been mistreated, threatened, or promised anything in exchange for the statement, then read the statement back to the witness, giving the witness an opportunity to make any necessary changes. Ms. Daly then read the statements into the record. On cross-examination, Ms. Daly acknowledged that she had no idea how long Ms. Mason and Ms. Butler were questioned before she arrived to take their statements.

¶ 40    ASA Lanahan testified that she met with Mr. Stewart, Ms. Butler, and Mr. Clay before each of them provided testimony before the grand jury. She reviewed with each witness his or her prior written statement and confirmed that it was correct, was not given while under the influence, and was not the result of threats or promises. Ms. Lanahan testified that, while questioning the witnesses before the grand jury, she again had occasion to show them their prior written statements. Ms. Lanahan then read the witnesses' grand jury testimony into the trial record in this case.

¶ 41    Mr. Jackson called no witnesses to testify and elected not to testify on his own behalf.

¶ 42                          3. Closing Arguments and Verdict

¶ 43    In its closing argument, the State encouraged the jury to believe the prior inconsistent statements made by the recanting witnesses over their trial testimony, pointing out that several of those statements were corroborated by the witnesses' testimony before the grand jury, which the prosecutor explained was "a secret proceeding done outside the presence of police." The prosecutor also stressed how powerful those incriminating statements were, coming as they did from Mr. Stewart, who was Mr. Jackson's cousin; his friends, Ms. Mason and Ms. Butler; and

his fellow gang member, Mr. Clay. He then urged the jury to conclude that the witnesses had changed their stories at trial because they were afraid to testify against Mr. Jackson, a known gang member, while he was in the same room with them:

> "Do you really expect those witnesses to come into this courtroom, as the defendant sits here looking at him or at them, do you really expect those witnesses to be able to point to the defendant and tell you that he's the shooter, that he's the killer? Of course not. Use your common sense."

¶ 44    Defense counsel, in turn, urged the jury to believe the witnesses when they testified that they had been coerced into naming Mr. Jackson as the shooter, arguing that the detectives "wanted to sweat these people." He reminded the jury that all of the witnesses "had stuff hanging over their heads" and that the assistant state's attorney who arrived later to take down their statements was not there for the many hours the detectives held the witnesses without charging them with anything.

¶ 45    In rebuttal, the prosecutor mocked the accusations of witness coercion ("[C]an you believe it, ladies and gentleman? Poor, poor Kevin Jackson. Brian Forberg is after you."), saying that he felt sorry for Detectives Forberg and Foster, and would not want to have their jobs because "[n]ot only do you have to deal with the people you saw on the witness stand and guys like this [apparently referring to Mr. Jackson or his counsel], but you've got to come into court and get smashed by people who aren't even paying attention to what you're doing or trying to do, which is investigate a crime. Your reputation has to get sullied by people that aren't even paying attention." The prosecutor also stressed how difficult it was for the detectives to do their jobs when confronted with untruthful witnesses:

> "And it's not because they're trying to harass people or do bad things. It's

because, unlike normal folks, some of these folks that you have seen and heard from, ladies and gentlemen, the truth is not the first thing that comes to their lips. It's not forced out of them, but you have to make them understand that you know what you're talking about, you know what happened out there on 55th and Damen, or you had a good idea."

¶ 46    The prosecutor again urged the jury to conclude that the witnesses' earlier statements were not the product of police coercion but rather that the witnesses recanted those statements at trial because they were intimidated by Mr. Jackson and the Vice Lords:

"Folks, I've got to tell you something. When these people were up here on the witness stand and they were crying and they were complaining about how the police locked them up and how this never happened and how this was all a lie, putting a case on Googy, they weren't talking for you. They weren't talking for you one bit. They were talking for this guy [Mr. Jackson] and the Conservative Vice Lords out there at 55th and Damen.

* * *

Can you imagine what will happen to them? Can you imagine what will happen to them if the Vice Lords find out they came in here and put it on him and said what he did?"

¶ 47    The jury deliberated for approximately seven hours that same day. At some time after 9 p.m., the jury submitted the following questions to the circuit court: "What is the law for hung jury? How long do we stay tonight? Is there a time limit? How do we sleep?" Defense counsel, noting that the jurors had been "arguing very loudly," asked the court to declare a mistrial. The court, confirming that "you [could] hear, without the specifics, vigorous discussion [was] going

on," noted that the jurors were at least still talking and sequestered them for the evening.

¶ 48    The next day, July 25, 2003, the jury reached a verdict, finding Mr. Jackson guilty of the first degree murder of Mr. Jenkins and the aggravated battery with a firearm of Michael Watson.

¶ 49    At that point the court made a record of some previous questions the jury had asked, including, "We are ten to two and nobody is changing their mind. What do we do?" In response to that question, the jury had again been told to continue its deliberations. The jurors also asked to have read back to them the court's preliminary comments to the venire about using their common sense, but that request was denied.

¶ 50    The circuit court denied Mr. Jackson's motion for a new trial and sentenced him to concurrent prison terms of 45 years and 6 years. In affirming Mr. Jackson's conviction and sentence on direct appeal, we (1) held that the prosecutor's statements in closing argument regarding likely gang intimidation as an alternative explanation for why the recanting witnesses changed their stories were within the bounds of proper argument; (2) held that the prior inconsistent statements and grand jury testimony of the recanting witnesses was properly admitted as substantive evidence under section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2000)); (3) agreed with a line of cases holding that prior inconsistent statements, alone, may sustain a conviction; and (4) rejected another line of cases holding that, without some independent corroboration, such statements are insufficient to support a finding of guilt. *Jackson*, slip order at 11, 15, 19, 25 (2006).

¶ 51                    B. Postconviction Proceedings

¶ 52    On March 16, 2007, Mr. Jackson filed a *pro se* petition for postconviction relief, arguing that his trial counsel was ineffective in several respects, including for failing to call Ms. Davis or Mr. Brown as witnesses, and that his appellate counsel was ineffective for failing to raise the

16

failures of his trial counsel on direct appeal.Relying on the testimony of the recanting witnesses that their initial identifications had been coerced, Mr. Jackson also argued that he was denied a fair trial because the State knowingly used perjured statements to convict him. On May 25, 2007, the circuit court denied Mr. Jackson's request for counsel and summarily dismissed his petition as frivolous and without merit.

¶ 53    On June 2, 2017, Mr. Jackson, this time represented by counsel, sought leave to file a second postconviction petition, based on new evidence that he argued demonstrated his actual innocence or, in the alternative, met the threshold showing of cause and prejudice necessary for the filing of a successive petition. Mr. Jackson attached to his petition a number of documents he argued established a pattern and practice of police misconduct by the detectives involved in this case—Detectives Brian Forberg, John Foster, John Clisham, Edwin Kaup Jr., David Kowalski, Robert Bartik, and Kevin Howley—whom he referred to as "The Seven." The documentation included logs of citizen complaint reports (CR logs) alleging police misconduct and documents relating to a complaint made by Ms. Davis that officers harassed her. Mr. Jackson also referenced publicly available news articles and documents in civil suits relating to claims that certain detectives had coerced suspects and witnesses into giving false statements on other occasions. These documents purporting to show an alleged pattern and practice of police misconduct are discussed in more detail in our analysis.

¶ 54    Mr. Jackson also included with his motion three new affidavits, signed by Manny Stewart, Brandy Butler (signed as Brandi Grant), and Quiana Davis. In his affidavit, Mr. Stewart attested that he "saw a dark black man, who [he] knew as Rick Party, shooting" and immediately drove away from the gas station. When Mr. Stewart arrived home, he went to his room downstairs, which was next to Mr. Jackson's room, and noticed that the door was closed. Mr.

17

Stewart believed Mr. Jackson had gone to bed earlier that night, before Mr. Stewart left the house. Mr. Stewart then explained in some detail how he came to sign his initial statement at the police station, concluding by stating that Kevin Jackson was not the shooter and that Mr. Stewart only signed a statement implicating Mr. Jackson because he was "scared of the threats the police made."

¶ 55    In her affidavit, Ms. Butler stated that while she was in the Citgo gas station, she looked out the window and saw a man running with a gun in his hand, she "recognized [the] man from the neighborhood and it was not Kevin Jackson," the "shooter's skin was darker than Kevin's, the shooter's hair was braided and Kevin's was not, and the shooter was skinnier than Kevin." Ms. Butler likewise explained in detail how she came to sign her initial statement implicating Mr. Jackson.

¶ 56    Finally, in her affidavit, Quiana Davis stated that she had not testified before the grand jury and was not called to testify at Mr. Jackson's trial. Ms. Davis said that, on the morning of the shooting, she and Ms. Butler were celebrating a friend's birthday when they asked Mr. Stewart and Mr. Brown to take them to the Citgo gas station. Ms. Davis saw Meechie coming out of the store, knew it was dangerous for him to be in a rival gang's territory, and got back in the car. Ms. Butler, however, had already gone into the gas station. When the shooting began, Ms. Davis said that she got out of the car and started running. She saw Mr. Stewart and Mr. Brown drive away and also got a look at the shooter, who she said ran right by her and "was dark-skinned." Ms. Davis said she recognized the man "as someone from the neighborhood *** and certainly not Kevin Jackson," whom she grew up with and would have recognized if she had seen him. Realizing Ms. Butler was still at the gas station, Ms. Davis returned and the two called the police.

¶ 57    Ms. Davis said that she and Ms. Butler were picked up, separately interrogated, and gave separate statements to the police that night. According to Ms. Davis, Detective Foster came to her home to interrogate her further about a week later and, a week after that, took her back to the police station, where she was interrogated for three days. Ms. Davis said the officers kept insisting that Mr. Jackson was the shooter and that Meechie had been flirting with her at the gas station, making Mr. Jackson jealous. She said "they just kept insisting that was the way it happened and pressur[ing] [her] to confirm their theory, no matter how many times [she] told them they were wrong." Ms. Davis offered to take a lie detector test and was told by Detective Foster that she had failed the test. She said "Detective Foster and the other detective yelled at [her], cursed at [her], called [her] a liar, and made [her] feel threatened and scared."

¶ 58    Ms. Davis explained how the detectives attempted to coerce her:

"37. Throughout my three days in custody, the police threatened me in several ways. They told me they would charge me as an accessory to the murder, they told me that they would not let me go home again, and they told me my daughter could be taken away and that I would never see her again. I knew they did not have anything on me, because I had done nothing wrong. But it was still scary to have them threaten me like this and it upset me a lot.

38. After they let me go, the police continued to harass me. They came by my house at all hours of the day and night looking for me *** they came so often that my mom made me move out *** I had to move out of my home with my one-year old daughter and essentially go into hiding at my sister's house to avoid their harassment.

* * *

45. I refused to give a statement naming Kevin as the shooter because he was not the shooter. And unlike Brandi, Shemika and Vernon, who all had outstanding warrants against them during the timeframe of the investigation or had other serious things in their background, I did not have either a warrant against me or anything serious in my background, so the police were not able to threaten and intimidate me the way they did them."

¶ 59 Ms. Davis said that she did not hear about the case for a while after that, probably in part because she moved out of the neighborhood, but that "[e]ventually, [she] was told that [her] testimony would not be needed during [Mr. Jackson's] trial."

¶ 60                              II. JURISDICTION

¶ 61 The circuit court denied Mr. Jackson leave to file his successive postconviction petition on June 15, 2017, and Mr. Jackson timely filed his notice of appeal on June 28, 2017. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 and 651, governing criminal appeals and appeals from final judgments in postconviction proceedings (Ill. S. Ct. R. 606 (eff. Dec. 11, 2014); R. 651(a) (eff. Feb. 6, 2013)).

¶ 62                              III. ANALYSIS

¶ 63 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) establishes procedures by which an incarcerated person may challenge his conviction or sentence by establishing that he suffered a substantial deprivation of constitutional rights in the proceedings resulting in that conviction. *Id.* § 122-1(a)(1). Postconviction proceedings in non-death penalty cases occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines, without input from the State, whether a petition is

frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2016). At the second stage, the circuit court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2016). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation does the defendant then proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2016).

¶ 64    "A postconviction proceeding is not an appeal from the judgment of conviction, but is a collateral attack on the trial court proceedings." *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Its scope is limited to constitutional issues that were not, and could not have been, previously adjudicated. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). Thus, the consideration of issues already decided by a reviewing court is barred by the doctrine of *res judicata*, and issues that could have been raised on direct appeal but were not are forfeited. *Id.*

¶ 65    In keeping with these principles, the Act contemplates the filing of only one postconviction petition. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). Claims not raised in the original or an amended petition are generally forfeited. 725 ILCS 5/122-3 (West 2016).

¶ 66    This statutory bar is relaxed in two limited circumstances. Leave to file a successive postconviction petition will be granted when a petitioner either "assert[s] a freestanding claim of actual innocence based on newly discovered evidence" (*Ortiz*, 235 Ill. 2d at 331) or satisfies both prongs of the cause-and-prejudice test, *i.e.*, "demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice result[ing] from that failure" (725 ILCS 5/122-1(f) (West 2016) (codifying the test established by our supreme court in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002))).

¶ 67 Although decisions granting or denying leave of court are generally reviewed for an abuse of discretion, our supreme court has held that "the cause and prejudice determination is a question of law to be decided on the pleadings and supporting documentation submitted to the court by the defendant-petitioner." *People v. Bailey*, 2017 IL 121450, ¶ 24. Our review is therefore *de novo*. *People v. Wrice*, 2012 IL 111860, ¶ 50.

¶ 68 Mr. Jackson argues that the circuit court should have granted him leave to file a successive petition because he made a *prima facie* showing of both actual innocence and cause and prejudice. We address each of these claims in turn.

¶ 69                                A. Actual Innocence

¶ 70 Mr. Jackson's primary focus on appeal, as it was in the circuit court, is on his claim of actual innocence—and on his argument that new evidence of a pattern and practice of police misconduct supports such a claim. We must reject this argument. To set forth a colorable claim of actual innocence in a successive postconviction petition, the petitioner's "request for leave of court and his supporting documentation [must] raise the probability that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *People v. Edwards*, 2012 IL 111711, ¶ 31. Newly discovered evidence relied upon merely "to *supplement* an assertion of a constitutional violation with respect to [the] trial" does not constitute a "free-standing claim of innocence." (Emphasis added.) (Internal quotations marks omitted.) *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998); see also *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008) (noting that " 'actual innocence' is not within the rubric of whether a defendant has been proved guilty beyond a reasonable doubt. [Citation.] Rather, the hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.' ").

¶ 71 In *Hobley*, 182 Ill. 2d at 444, our supreme court rejected the argument that newly

discovered evidence of "a pattern and practice of police torture" supported a freestanding claim of actual innocence, finding instead that the defendant in that case sought "to supplement [his] assertion *** that his confessions were coerced and involuntary and that the introduction of th[o]se confessions violated his constitutional rights." Mr. Jackson's claim of actual innocence based on newly discovered evidence of a pattern and practice of police misconduct fails for the same reason.

¶ 72 Mr. Jackson also argues that he has demonstrated actual innocence on the basis of the three new affidavits presented with his motion for leave to file a second petition—from Mr. Stewart, Ms. Butler, and Ms. Davis. To support a claim of actual innocence, evidence "must be newly discovered; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." (Internal quotation marks omitted.) *Ortiz*, 235 Ill. 2d at 333. Newly discovered evidence is "evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence." *Id.* at 334. Evidence is material if it is probative of the defendant's innocence. *People v. Coleman*, 2013 IL 113307, ¶ 96. It is cumulative when it adds nothing to what was already before the jury. *Ortiz*, 235 Ill. 2d at 335.

¶ 73 The new affidavits provided by Mr. Stewart and Ms. Butler are consistent with the testimony they provided at trial. Both of these witnesses testified that Mr. Jackson was not the shooter and that their prior statements to the contrary were coerced by the detectives who interrogated them. To the extent that the new affidavits provide some additional details regarding the person the witnesses claim was the actual shooter or the manner in which the witnesses say they were coerced by the police, those additional supporting details do not constitute evidence "of such conclusive character that it would probably change the result on retrial." (Internal

quotation marks omitted.) *Id.* at 333. Nor do those additional details constitute evidence that Mr. Jackson "could not have discovered sooner through due diligence." *Id.* at 334.

¶ 74    Ms. Davis's affidavit, however, is not cumulative of the testimony offered at trial by other witnesses. Evidence is only cumulative if it "adds nothing to what was already before the jury." *Id.* at 335. This case turned on credibility determinations. The testimony of another eyewitness, who knew Mr. Jackson well, who would have recognized him, and who did not identify him but instead described someone else as the shooter, would have added something new to the evidence before the jury. And, unlike the other witnesses, Ms. Davis never signed a statement implicating Mr. Jackson as the shooter.

¶ 75    The question remains, however, whether Ms. Davis's affidavit constitutes newly discovered evidence. We first reject the notion, which appears to have been adopted by the circuit court, that we should focus on whether the *information* Ms. Davis now offers is newly discovered. The trial court pointed to the fact that it is not new information to Mr. Jackson that he was not the shooter and that the police were trying to coerce witnesses into saying that he was. Our supreme court has made clear that a claim of actual innocence based on the testimony of an additional eyewitness previously unknown to the defendant constitutes a new "claim" of actual innocence. *Id.* at 333-35. To hold otherwise would prevent innocent defendants, necessarily aware of their own innocence, from ever asserting claims of actual innocence based on newly discovered evidence supporting their exoneration.

¶ 76    However, newly discovered evidence offered in support a claim of actual innocence must also be evidence "that the defendant *could not* have discovered sooner through due diligence." (Emphasis added.) *Id.* at 334. Ms. Davis states in her affidavit that she had to "go into hiding," was "on the run" to avoid police harassment, and eventually moved away from her

24

neighborhood, indicating that it may not have been a simple matter for defense counsel to locate and speak with her before trial. As the State points out, however, the unsigned affidavit of Ms. Davis that Mr. Jackson attached to his initial postconviction petition indicates that she *was* in contact with an investigator for the public defender's office before Mr. Jackson's trial ("I also talked to Kevin Jackson['s] investigator Mary Clements, [about] exactly what happen the night of the shooting, she explained to me that I'll be subpoena[ed] to testify in Kevin's trial."). And Ms. Davis's new, signed affidavit indicates that counsel ultimately told her that her testimony was not needed at trial ("Eventually, I was told that my testimony would not be needed during Kevin's trial. *** [T]he next time I recall hearing anything about Kevin's case was when he was sentenced."). Under these circumstances, Mr. Jackson has not shown that he could not have discovered Ms. Davis's exonerating testimony sooner through due diligence.

¶ 77 We agree with the circuit court that Mr. Jackson failed to satisfy his burden of showing that the material, noncumulative evidence of his innocence he has raised at this point could not have been discovered by him prior to trial. His motion for leave to file a second petition was thus properly denied as to his claim of actual innocence.

¶ 78                    B. Cause and Prejudice

¶ 79 We next consider whether the documentation relied on by Mr. Jackson—though insufficient to support a freestanding claim of actual innocence—was nevertheless sufficient to support allegations of cause and prejudice based on a pattern and practice of police coercion. Mr. Jackson argues that because the trial evidence itself was so weak, any evidence that the officers in this case had engaged in coercive conduct similar to that alleged by the four recanting witnesses would have changed the outcome of the trial.

¶ 80 There are at least two possible avenues for the introduction of such evidence. A

defendant might seek to introduce evidence of prior police misconduct to impeach a testifying officer at trial. See *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 74 (finding it "plausible that a finder of fact could view the evidence of [a detective's] pattern of misconduct as leveling the playing field between [the detective] and [a recanting witness] in terms of credibility"). Alternatively, such evidence might be presented before trial, at a hearing on a motion to bar a recanting witness's prior statement. *Cf. People v. Reyes*, 369 Ill. App. 3d 1, 19 (2006) (concluding that "if even a fraction of the allegations" of misconduct against a detective had been presented before trial, "it appear[ed] likely that [the detective's] credibility would have been damaged and [the] defendant's confessions would have been suppressed"); *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 66 (noting that it is a due process violation for a conviction to be based on testimony the police know is false).

¶ 81    We turn first to whether Mr. Jackson had cause for not seeking to present this evidence sooner. "[A] prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings ***." 725 ILCS 5/122-1(f) (West 2016). We have held that "[a] defendant's lack of evidence that an officer has committed misconduct in circumstances similar to those of the defendant can serve as cause for failing to fully raise that claim in prior proceedings." *People v. Jones*, 2017 IL App (1st) 123371, ¶ 181 (citing *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 64-68). Here, alleged misconduct by some of the detectives in this case has come to light after Mr. Jackson filed his initial postconviction petition in 2007. The news articles attached to his petition were not written until 2013 and 2014, and the filings and decisions in the civil cases that Mr. Jackson has attached all date from 2009 or later. The CR logs, some of which refer to complaints made before Mr. Jackson's trial, are accompanied by correspondence and litigation documents showing that, after

considerable efforts, Mr. Jackson's counsel only recently obtained them. Mr. Jackson has clearly shown cause, in terms of an inability to present these recently obtained documents alleging police misconduct in an earlier proceeding.

¶ 82    The question then is whether Mr. Jackson has yet made a *prima facie* showing of prejudice. A defendant shows prejudice "by demonstrating that [a] claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016). Mr. Jackson argues that evidence of a pattern and practice of police misconduct by the detectives in this case would have allowed him to more fully challenge both the prior inconsistent statements of the recanting witnesses and the State's claim that those statements were truthful, while the recantations at trial were not.

¶ 83    The State does not dispute that if these witnesses falsely identified Mr. Jackson as the shooter because they were coerced to do so, that would constitute a due process violation. Nor does the State dispute that evidence establishing that these officers engaged in a pattern of coercion that was similar to what the witnesses said occurred here could support such a claim. Although this court found on direct appeal that the State's evidence was sufficient to support a finding of guilt (*Jackson*, slip order at 16 (2006)), we agree with Mr. Jackson that evidence of past witness coercion by the same officers involved here may well have made a difference in the outcome of this case, particularly where there was no evidence, other than the recanting witnesses' inconsistent statements, tying Mr. Jackson to the shooting and the surviving victim clearly and consistently testified that Mr. Jackson was not the shooter. Such evidence would have flown in the face of the State's closing arguments, in which the prosecutor mocked the recanting witnesses' stories of coercion and invited the jury to share in his outrage that honest, hard-

working officers could be subjected to baseless accusations of misconduct when they were simply trying to do their jobs. Given the nature of the determination the jury was asked to make, we find it likely that evidence of a relevant pattern and practice of the same or similar conduct by the same detectives could have led the jury to conclude that there was reasonable doubt of Mr. Jackson's guilt.

¶ 84    At this point, however, the documentation that Mr. Jackson has been able to marshal in support of his motion fails to connect any new evidence of police misconduct to what happened in his own case. As an initial matter, although Mr. Jackson refers to the detectives who played the largest roles in this case, collectively, as "The Seven," he has provided no evidence that they worked together in other cases to coerce witnesses. Indeed, the news articles and documents from various civil suits that Mr. Jackson relies on indicate that these detectives did *not* routinely investigate crimes together as a team. Mr. Jackson has not argued that the detectives acted in concert, pursuant to an express or implied agreement to coerce witnesses, or advanced any other argument for why alleged wrongdoing by one of the detectives should be considered relevant to any of the other detectives. See *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 65 (1994) (recognizing that "once [a] conspiracy is formed, all of its members are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy"). Nor has he made supported allegations of a systemic pattern of witness coercion infecting an entire investigatory unit or department. See *People v. Patterson*, 192 Ill. 2d 93, 145 (2000) (noting that a report of the Chicago Police Department's office of professional standards concluded that torture like that alleged by the defendant in that case was "systemic and methodical at Area 2 under the command of [Lieutenant Jon] Burge"). In short, Mr. Jackson has given us no reason to attribute alleged bad acts by certain members of "The Seven" to the group as a whole, or even to some

28

subset or partnership within the group.

¶ 85    We must therefore consider the alleged actions of each detective separately, finding other instances of misconduct by a particular officer to be relevant to Mr. Jackson's claim of prejudice only if those actions are similar to the misconduct the recanting witnesses in this case accused *that* officer of engaging in. See *People v. Nicholas*, 2013 IL App (1st) 103202, ¶ 40 (concluding that a defendant established prejudice where his claim that officers beat him into making a false confession was "strikingly similar *** as to the time period, location, manner, method, participants and the role of the participants" to prior acts of torture a special prosecutor found had taken place in other cases). We have carefully examined the details surrounding the other instances of alleged misconduct that Mr. Jackson cites in his motion for leave to file a successive petition and find that they fail to align in any meaningful way with what the witnesses in this case say those same officers did to them. We address the specifics officer by officer.

¶ 86    The only documents relating to other alleged misconduct by any of the three officers who interviewed Mr. Stewart and Ms. Davis (Detectives Clisham, Kaup, and Kowalski) consist of CR logs listing a handful of complaints filed over the years. These complaints are generally listed by category, with few details from which we can assess the nature of the misconduct reported. Of the 10 entries relating to Detective Clisham, who interrogated Mr. Stewart, all appear to have been either "not sustained" or "unfounded" and none involved the alleged intimidation or coercion of a witness. There is one CR log entry alleging that Detectives Kaup and Kowalski used excessive force to coerce a video confession in August 2002. But those detectives interrogated only Ms. Davis, who never provided any evidence against Mr. Jackson. Thus, these documents purporting to show a pattern and practice of witness coercion by these two detectives cannot be connected to Mr. Jackson's claim that evidence used to convict him was the result of

coercion.

¶ 87    Documentation regarding prior conduct by Detective Bartik, in the form of a 2013 newspaper article quoting the testimony of an expert witness who was critical of Bartik's record of pre-test confessions over a five-year period ending in 2003 (see Duaa Eldeib, *Polygraphs and False Confessions in Chicago*, Chi. Trib., Mar. 10, 2013, http://www.chicagotribune.com/news/ watchdog/ct-met-polygraph-confessions-20130310-story.html), is likewise not relevant because he questioned only Ms. Davis, who did not testify at trial. No connection has been made between anything Detective Bartik did and Mr. Jackson's conviction.

¶ 88    Mr. Jackson also points to the same news article as evidence of alleged misconduct by Detective Howley. The article quotes another expert witness who criticized Detective Howley's tactic of using a polygraph examination to extract a confession, purportedly in violation of relevant protocols governing such examinations. Here, Detective Howley questioned and administered a polygraph test to Mr. Stewart, who did in fact give a pretrial statement identifying Mr. Jackson. Missing, however, is any suggestion by Mr. Stewart that Detective Howley coerced him into giving a false statement. We understand that Mr. Jackson might not have been allowed to bring this information out at trial, since the trial court judge sustained defense counsel's objection to any testimony about the polygraph examination. But notably, Mr. Stewart's current affidavit also says nothing about his polygraph examination or about Detective Howley.

¶ 89    Turning to the two lead detectives in this case, Detectives Forberg and Foster, we are faced with the opposite situation: ample trial testimony regarding alleged coercion in this case but insufficient documentation supporting an alleged pattern and practice of similar misconduct by these officers. According to the trial testimony of Ms. Butler and Mr. Clay, these detectives held them in police custody for multiple days and coerced them into making their initial

statements identifying Mr. Jackson as the shooter by threatening to charge them criminally if they refused adopt the officers' version of events. Ms. Butler testified that she was warned she would give birth in prison and her child would be taken from her, and Mr. Clay additionally said he was tricked into signing his initial statement, which he thought was something he needed to sign to have his personal property returned to him before he could leave the police station. Ms. Mason similarly testified that she was held overnight by the two detectives and was told that if she went along with what they wanted her to say, an outstanding warrant for her arrest would be "take[n] care of."

¶ 90     Aside from the CR logs, which contain no allegations of witness coercion, Mr. Jackson points to a complaint in a civil suit naming Detectives Forberg and Foster, along with a number of other defendants, and alleging generally that "the defendants" withheld food and water from witnesses and manipulated them into giving false statements, without specifically identifying Forberg or Foster as the perpetrators of this alleged misconduct. Complaint at 4, *Patterson v. City of Chicago*, No. 11 CV 07052, ECF No. 1, (N.D. Ill. 2011). Mr. Jackson also relies on a federal district court opinion granting summary judgment in favor of the defendant police officers in that case, where the court recounted, as part of the "facts on which the parties agree[d]," how Detective Forberg (working with a different partner) obtained statements from witnesses after interrogating them for many hours without bathroom breaks. *Bridewell v. City of Chicago*, No. 08 C 4947, 2012 WL 2458548, at * 1 (N.D. Ill. June 27, 2012). Even taking the allegations in the civil suit as true, this documentation, by itself, is "insufficient to justify further proceedings" (internal quotation marks omitted) (*Bailey*, 2017 IL 121450, ¶ 21). The conduct alleged—coercion by withholding food, water, and bathroom breaks or by "manipulate[ing]" witnesses is similar but not "strikingly similar" to the alleged coercion in this case, which the

recanting witnesses made clear was primarily achieved through threats that criminal charges would be pursued against them if they did not name Mr. Jackson as the shooter. One of the incidents Mr. Jackson offers as indicia of a pattern and practice of misconduct took place five years after the investigation and three years after the trial in this case. And in only one of the cases did the detectives together, as partners, interrogate witnesses, as they did in this case. We are simply unable to conclude that in this successive petition Mr. Jackson has supplied "enough in the way of documentation" to "justify further proceedings" (internal quotation marks omitted) (*id.* ¶ 21) on his claim that he was prejudiced by the inability to present evidence that the detectives in this case engaged in a pattern and practice of similar witness coercion in other cases.

¶ 91    We are well aware that police misconduct, including witness coercion, does occur. We also understand that courts must play a significant role in ensuring that individuals are not wrongfully imprisoned as a result of such tactics. Although the cause-and-prejudice test represents a significant hurdle, successive postconviction petitions are a proper tool for prisoners to raise previously unavailable evidence of police misconduct and to point out similarities between that conduct and what occurred in their cases, as such evidence becomes available. The test is met when a defendant can connect specific misconduct resulting in his conviction to sufficiently similar misconduct by the same officer or officers. If more evidence of misconduct is uncovered—either through proceedings in other cases, news coverage, the ongoing investigation of counsel where a prisoner is fortunate enough to be represented, or because witnesses have come forward with new information—and as patterns of misconduct are established with respect to individual officers or investigatory teams, a petitioner may be able to more closely connect documentation of improper tactics to his own conviction. And as our supreme court has made

clear, even a third or fourth petition may be allowed, provided that a petitioner can overcome the hurdle of showing cause and prejudice. *Edwards*, 2012 IL 111711, ¶ 22.

¶ 92    Here, although Mr. Jackson and his counsel were able to gather a number of documents relating to alleged police misconduct, they have not, at this point, made the necessary connection between the alleged misconduct of any one officer that Mr. Jackson claims led to his conviction and a pattern and practice of sufficiently similar misconduct by that same officer. We must therefore affirm the circuit court's denial of Mr. Jackson's motion for leave to file a successive postconviction petition.

¶ 93                                    IV. CONCLUSION

¶ 94    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 95    Affirmed.

¶ 96           **SEPARATE OPINION UPON DENIAL OF REHEARING**

¶ 97    PRESIDING JUSTICE MIKVA, dissenting:

¶ 98    Although I authored the court's opinion in this case, I now believe that we should grant Mr. Jackson's petition for rehearing, reverse the circuit court's order denying him leave to file his successive postconviction petition, and remand for Mr. Jackson to make his case for a new trial. The new evidence Mr. Jackson seeks to introduce includes both the affidavit of Quiana Davis—an eyewitness who says she was at the scene of the crime, she saw the shooter, and that it was not Mr. Jackson—and examples of police coercion of witnesses by some of the officers in the case. Mr. Jackson argues that the evidence of police coercion corroborates the trial testimony of four recanting eyewitnesses, all of whom testified that Mr. Jackson was not the shooter and that they had previously been coerced into saying he was by the interrogating officers.

¶ 99 In our opinion affirming the circuit court's order, we held that because Ms. Davis was known to Mr. Jackson at the time of trial, her affidavit was not "newly discovered" and, thus, could not be used to raise a claim of actual innocence. We also held that the evidence of other coercive conduct by police officers was not "strikingly similar" to the conduct recounted by the recanting witnesses at trial and did not therefore support Mr. Jackson's claim of witness coercion.

¶ 100 In November, Mr. Jackson sought leave to supplement the record with additional evidence about the officers' past conduct, and we denied that request on the basis that it would be improper for us to consider documents that were not before the circuit court. But we did allow briefing on Mr. Jackson's petition for rehearing, which we have now received and considered. The majority of the panel has decided not to grant the petition. I dissent from that denial for the reasons that follow.

¶ 101 This case has all the hallmarks of one in which the wrong person was convicted. Statements made to the police that were unequivocally recanted at trial were the *only* evidence of Mr. Jackson's guilt. The recanting witnesses' accounts of their interrogations and the reasons they felt pressured to falsely identify Mr. Jackson when they were picked up and questioned by the police were remarkably consistent. No physical evidence linked Mr. Jackson to the crime. And—of greatest significance to me—the surviving victim, Michael Watson, gave clear, specific, and compelling testimony that Mr. Jackson was *not* the person who shot him. No testimony suggested that Mr. Watson had any reason to protect Mr. Jackson. Mr. Watson's testimony, consistent with what he told police immediately after the shooting, was that the shooter was "a little, thin guy, about [a] hundred and twenty pounds," with "dark black" skin. Mr. Watson did not know who shot him but was certain it was not Mr. Jackson. Mr. Watson did

not identify Mr. Jackson as the shooter in a photo array or a lineup, and at trial he said unequivocally, "I never seen that young man before *** he don't look nothing like the guy 'cause the guy who shot me, when I say black, I mean he's a black person, but he was dark, dark black."

¶ 102   I find this exonerating testimony from the surviving victim, supported by specific details about the shooter's appearance, to be very persuasive, and I believe it distinguishes this case from others in which recanted testimony, on its own, was deemed sufficient to support a finding of guilt. Courts have, in varying circumstances, recognized the persuasive power of such testimony. See, *e.g.*, *People v. Henderson*, 2014 IL App (2d) 121219, ¶ 35 (concluding that newly discovered exonerating testimony from a surviving witness " arguably would carry weight with the trier of fact," such that "*all* of the facts and surrounding circumstances, including [the new] testimony, should be scrutinized more closely to determine [the] defendant's guilt or innocence" (emphasis added)); *People v. Newborn*, 379 Ill. App. 3d 240, 249 (2008) (concluding that, where the victim's in-court testimony exonerated the defendant, the trial court's refusal to allow impeachment of the only other eyewitness with evidence of his prior juvenile adjudications could not be considered harmless error).

¶ 103   The State argued that all of the witnesses—apparently including Mr. Watson—were essentially putting on a show at trial because they were afraid of Mr. Jackson and his gang. This argument was supported by nothing in the record as to Mr. Watson. And with respect to the recanting witnesses, the only support came from their initial statements to police, which they testified at trial had been coerced. The jurors of course heard all of this and, although the record suggests that they had some difficulty in reaching a verdict, they did find Mr. Jackson guilty of the crimes he was charged with, a conclusion that this court affirmed on direct appeal and that

we must now respect. But if we are to fairly consider whether the new evidence Mr. Jackson now presents would have resulted in a different outcome, we must first acknowledge how thin the trial evidence really was.

¶ 104    With this as my starting point, I now find myself persuaded by several of the arguments in Mr. Jackson's petition for rehearing.

¶ 105                          A. Quiana Davis's Affidavit

¶ 106    I now believe that, in the unusual context of this case, we should consider Quiana Davis's signed affidavit to be "newly discovered" because, at the time Mr. Jackson filed his initial *pro se* petition, it was not available to him in any form the circuit court would consider.

¶ 107    Ms. Davis, who was present at the scene of the crime, was interrogated by the police. Unlike the recanting witnesses, she never implicated Mr. Jackson. But defense counsel never called Ms. Davis as a witness at trial. Mr. Jackson raised this failure in his initial *pro se* postconviction petition, in which he claimed ineffective assistance of counsel. That claim was dismissed as frivolous by the circuit court for the sole reason that the attached affidavit giving Ms. Davis's account—which Mr. Jackson stated in his own signed affidavit reflected a conversation he had with her when she visited him in prison—was unsigned. Mr. Jackson explained in his petition that he was "without any income or assets with which to procure counsel to get [the affidavit] signed," and asked for postconviction counsel to be appointed for that purpose.

¶ 108    The law governing the summary dismissal of postconviction petitions at the first stage has evolved significantly since 2007, when we affirmed the trial court's summary dismissal of Mr. Jackson's initial *pro se* petition for failure to attach a signed witness affidavit. The Post-Conviction Hearing Act (Act) requires a postconviction petition to be supported by "affidavits,

records, or other evidence supporting its allegations," or to "state why the same are not attached." 725 ILCS 5/122-2 (West 2016). As our supreme court recently explained in a case involving an unnotarized factual statement styled as an affidavit, a supporting document that is "not an admissible affidavit in its present form," still properly qualifies as " 'other evidence,' " if it serves the purpose contemplated by the statutory requirement, *i.e.*, by "showing that the petition's allegations are capable of corroboration" and "identifying the sources, character, and availability of evidence alleged to support the petition's allegations." *People v. Allen*, 2015 IL 113135, ¶ 34. The court has also taken pains to remind us that summary dismissal is only proper when a petition "lacks an arguable basis either in law or in fact" or is "based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). Judged by today's legal standards, it is likely that Mr. Jackson's initial *pro se* petition proffering this evidence of innocence and of ineffective assistance of counsel would not be summarily dismissed.

¶ 109   And Mr. Jackson's counsel is correct that a more relaxed standard of "newly discovered" has been applied in a number of circumstances where to do otherwise would risk denying a defendant any real opportunity to show his innocence. These include cases in which previously known witnesses would have been uncooperative (see *People v. Coleman*, 2013 IL 113307, ¶ 102), police records that existed prior to trial were difficult to obtain (see *People v. Tyler*, 2015 IL App (1st) 123470, ¶¶ 161-62), and information revealed in other legal proceedings, though public, would have required great time and effort for counsel to locate (see *id.*). Most compelling in my view is *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 130, in which a panel of this court held that it "would be a miscarriage of justice" if the defendant in that case—whose postconviction counsel had inexplicably failed to amend his petition to include the supporting

37

affidavits of available witnesses—was "denied his day in court where his allegations and supporting documentation, supported by the record and taken as true ***, demonstrate[d] that he was unable to put forth exculpatory evidence of his innocence through no fault of his own."

¶ 110   Here, Ms. Davis was an eyewitness to the crime who says she was prepared to testify at trial that she saw the shooter and it was not Mr. Jackson. And unlike the recanting witnesses, she had never given a conflicting account with which the State could have impeached her. Her account of how she was treated by the officers in this case, and her claim that she was able to withstand their pressure to falsely identify Mr. Jackson as the shooter because she had no outstanding warrant that the officers could use against her, also corroborates the trial testimony of the recanting witnesses. I believe that failing to consider Ms. Davis's account on the basis that she was technically known to defendant, even though—through no fault of his own—he has been precluded at every step from putting forward her exculpatory testimony, would be just the sort of fundamental miscarriage of justice that the actual innocence exception to the bar on successive petitions is intended to prevent.

¶ 111                    B. Evidence of Other Coercive Conduct by Police Officers

¶ 112   I still believe that, for most of the detectives involved in this case, Mr. Jackson has failed to establish prejudice by connecting the dots between what the recanting witnesses said happened to them and evidence of prior coercive behavior on the part of those specific officers. However, I am now convinced that Mr. Jackson has met his burden with respect to Detectives Forberg and Foster, the lead detectives who handled this case. As detailed in our opinion, the relevant evidence consisted of (1) a complaint in a civil suit filed against a handful of officers, including Detectives Forberg and Foster, alleging generally that witnesses were denied food and water and were manipulated into giving false statements (see complaint at 4, *Patterson v. City of*

38

*Chicago*, No. 11 CV 07052, ECF No. 1, (N.D. Ill. 2011)), and (2) a federal district court opinion in another case in which the court recounted, as part of the "facts on which the parties agree[d]," how Detective Forberg (working with a different partner) obtained statements from witnesses after interrogating them for many hours without bathroom breaks (*Bridewell v. City of Chicago*, No. 08 C 4947, 2012 WL 2458548, at \*1 (N.D. Ill. June 27, 2012)). We concluded that this conduct was "similar but not 'strikingly similar' " to the coercion alleged by the recanting witnesses in this case. *Supra* ¶ 90. I now think this was the wrong standard, based on our incorrect assumption that Mr. Jackson needed to show that a particular type of coercion was the *modus operandi* of these police officers and our failure to differentiate between propensity evidence offered against a defendant and evidence used by a defendant to demonstrate his innocence.

¶ 113    To show prejudice, the Act requires a defendant to demonstrate that a claim not raised during his initial postconviction proceedings "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016). Mr. Jackson is correct that, when the basis for a postconviction petition is evidence of prior police conduct, there is no express requirement that the conduct must be "strikingly similar" to what the petitioner claims the police did in his case. "Strikingly similar" is a phrase we have used when prejudice is clearly shown, as in cases involving confessions made under police torture. See *e.g.*, *People v. Patterson*, 192 Ill. 2d 93, 145 (2000); *People v. Nicholas*, 2013 IL App (1st) 103202, ¶ 47. But we have never held that such evidence must be "strikingly similar" in order to be relevant or admissible.

¶ 114   Evidence is relevant if it has "any tendency" to make the existence of a fact of consequence more or less probable than it would otherwise be. Ill. R. Evid. 401 (eff. Jan. 1,

2011) (codifying the common law definition). Although propensity evidence is generally excluded, even if relevant, for fear that a jury might improperly draw an inference of guilt from prior bad acts, our supreme court has noted that this concern is not present when a *defendant* seeks to introduce exculpatory evidence of *someone else's* prior conduct. *People v. Cruz*, 162 Ill. 2d 314, 348-50 (1994). As the court has further explained, although "a substantial and meaningful link between the offenses being compared" is required when propensity evidence is admitted to prove a particular *modus operandi*, a lesser degree of similarity will suffice when such evidence is admitted for any other purpose; to corroborate witness testimony, for example. *Id.* at 351-53.

¶ 115   In *Cruz*, evidence of a third-party's past crimes, though dissimilar in many respects to the offense at issue and thus inadmissible to establish *modus operandi*, was still relevant to corroborate the third-party's statement that he committed the crimes alone, without the defendant's help. *Id.* at 355. When the theory that the two men had worked together was "an essential element of the State's case," the defendant "was thus entitled to rebut the evidence of that linkage with nonprejudicial and relevant evidence." *Id.*

¶ 116   The State's theory was that the recanting witnesses changed their stories, not, as they explained at trial, because they had been coerced into identifying Mr. Jackson by Detectives Forberg and Foster, but because they feared gang retribution if they told the truth on the stand. Mr. Jackson was unable to rebut that theory in any meaningful way at trial. Had he been able to present evidence, however slight, that one or more of the same detectives had coerced other witnesses into giving false testimony or into identifying a particular person, it may well have changed the outcome of his trial. While the allegations in *Patterson*, the facts recited by the court in *Bridewell*, and the allegations in this case may not be sufficiently similar to establish a

*modus operandi* on the parts of Detectives Forberg and Foster, they surely lend a degree of support to the allegations of coercion leveled against these officers by the recanting witnesses. I am convinced by the petition for rehearing that by demanding that this evidence be "strikingly similar," we applied an overly rigorous standard on this issue.

¶ 117                    C. The Combined Force of Mr. Jackson's New Evidence

¶ 118   This brings me to a third point raised in Mr. Jackson's petition for rehearing that I think warrants discussion. Mr. Jackson initially asked us to consider the evidence of prior coercive conduct by the officers as further evidence of his actual innocence, which, together with Ms. Davis's affidavit, he argued made a strong showing in that regard. We declined to do so, concluding that, as in *Hobley*, the evidence was not presented as a wholly independent basis establishing the defendant's innocence but to supplement a due process claim. *Supra* ¶ 71 (citing *People v. Hobley*, 182 Ill. 2d 404, 444 (1998)).

¶ 119   Mr. Jackson argued in his initial briefing and in his petition for rehearing that the distinction drawn in cases like *Hobley* and *People v. Orange*, 195 Ill. 2d 437, 460 (2001), between "freestanding" claims of actual innocence and claims relating to procedural defects at trial was "repudiated" by our supreme court in *Coleman*, 2013 IL 113307, ¶ 83. I do not believe that *Coleman*, which mentions neither *Hobley* nor *Orange*, was intended to overrule those cases in any way. What *Coleman* stands for is the proposition that, contrary to federal *habeas* law, a "freestanding" claim of actual innocence is cognizable under the Illinois Constitution, even when it is not also a due process claim. See *id.* ¶¶ 90-91. The recognition of freestanding actual innocence claims is not only alive and well in this state, it is a decidedly *good* thing for postconviction petitioners since it allows them to bring claims of actual innocence even where they cannot demonstrate due process errors in their trials. See *id.* ¶ 94 (reiterating, as the court

first stated in *People v. Washington*, 171 Ill. 2d 475, 489 (1996), that " 'no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence' ").

¶ 120   The important point that Mr. Jackson makes—and that I think, upon rereading them, is fully consistent with our supreme court's opinions—is that in considering the support for a successive petition, the "actual innocence" evidence of Ms. Davis's affidavit should not be siloed off and considered separately from the "cause-and-prejudice" evidence of prior coercive police misconduct. Rather, the combined strength of all the new evidence should be considered in light of the evidence already presented at trial. See *People v. Ortiz*, 385 Ill. App. 3d 1, 12-13 (2008) (discussing the combined effect of all the evidence available to the defendant on a successive postconviction petition, and whether, when added to the evidence presented at trial, it would likely lead to a different result), *aff'd*, 235 Ill. 2d 319, 336-37 (2009). This is especially important here, where Ms. Davis's affidavit not only contains exonerating testimony but also corroborates the recanting witnesses' accounts of coercive police conduct, which are further corroborated by evidence that the detectives may have coerced other witnesses.

¶ 121   In sum, I believe fundamental fairness dictates that we consider both Ms. Davis's affidavit and evidence of other coercive conduct by Detectives Forberg and Foster. When we look at the strength of that combined evidence in light of what was actually presented at trial, I find it difficult, if not impossible, to believe that the outcome would be the same, *i.e.*, that a reasonable jury considering the unequivocally exonerating testimony of the surviving victim, the detailed and consistent accounts of coercion given by the recanting witnesses at trial, the evidence of witness coercion by some of the same detectives in the *Patterson* and *Bridewell* cases, *and* the testimony of Ms. Davis would still find Mr. Jackson guilty. Mr. Jackson should be allowed to file his successive petition and make his case for a new trial based on all of the

evidence now available to him.