2022 IL App (1st) 192048

SIXTH DIVISION
February 4, 2022

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-2048

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 10824 |
| | ) | |
| JABER WILSON, | ) | Honorable |
| | ) | Timothy Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Oden Johnson concurred in the judgment and opinion.
Presiding Justice Pierce concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 This is an appeal from the second-stage dismissal of defendant Jaber Wilson's postconviction petition. Following a jury trial, Mr. Wilson was convicted of first degree murder and sentenced to 65 years in prison. In his petition, Mr. Wilson asserted, among other things, (1) actual innocence based on the affidavit of a previously unknown eyewitness who would testify that he saw another man shoot and kill the victim and (2) that, as applied to him, a *de facto* life sentence for a crime committed when he was 19 years old violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The circuit court dismissed Mr. Wilson's amended petition, concluding that he had failed to make a substantial showing of a constitutional violation under either theory. Mr. Wilson now appeals. For the reasons that follow,

we disagree with the circuit court's assessment of the legal sufficiency of both of Mr. Wilson's claims and reverse and remand this matter for a third-stage evidentiary hearing.

¶ 2                                    I. BACKGROUND

¶ 3     The victim in this case, Geno Moffett, was fatally shot shortly after 11 p.m. on September 20, 2006, at the Buchanan Barbershop, located at 430 East 75th Street in Chicago. Following a two-day jury trial, Mr. Wilson was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) and sentenced to 65 years in prison—40 years for the murder (730 ILCS 5/5-4.5-20(a) (West 2008)) plus a mandatory firearm enhancement of 25 years (*id.* § 5-8-1(a)(1)(d)(iii)).

¶ 4                              A. Mr. Wilson's Trial

¶ 5     The evidence presented at trial, though already summarized by this court in Mr. Wilson's earlier appeals, is revisited and set out again here to provide context for Mr. Wilson's actual innocence claim and to acknowledge certain details that, in light of the new evidence Mr. Wilson has submitted in support of that claim, may bear additional scrutiny.

¶ 6                              1. The Physical Evidence

¶ 7     An autopsy confirmed that Mr. Moffett died of gunshot wounds to the abdomen, lower back, and head. According to the assistant medical examiner, those wounds were not the result of close-range firing, meaning the shooter had to have been more than a foot and a half away. Two bullets were recovered from Mr. Moffett's body and a third, fired from the same gun, was found on the floor of the barbershop. The State's ballistics expert concluded that the murder weapon was likely a .357 or .38 special caliber Colt revolver. When the shooting occurred, Mr. Moffett was wearing blue jeans and a brown T-shirt. In photographs and a video of the crime scene that was played for the jury, blood stains are visible on the carpet behind the front desk of the barbershop and an orange floppy hat and cell phone can be seen lying on the floor. The video also shows that

vertical blinds installed in the storefront windows of the barbershop were drawn back from the center, partially blocking the left and far right edges of the windows but leaving a large section in the middle unobscured, such that the interior of the barbershop was visible from the outside.

¶ 8                                    2. The State's Eyewitnesses

¶ 9     Lacking any physical evidence suggesting that Mr. Wilson was the shooter, the State's case against him hinged on the testimony of two eyewitnesses: Jamique Walker and Markis Robinson. The accounts these witnesses provided were largely, though not entirely, consistent with each other. Mr. Walker testified that he cut hair at the barbershop and that on the night of the shooting he was in possession of a laptop belonging to the victim, which he planned to return to Mr. Moffett that night. Mr. Walker had gone to get the laptop and was on his way back to the barbershop when he saw Mr. Robinson, a long-time friend of Mr. Moffett's. Mr. Robinson testified that he had borrowed Mr. Moffett's Range Rover and likewise planned to return it to him that night. Mr. Robinson took the laptop for Mr. Moffett and also arranged to meet Mr. Walker at the barbershop to get a haircut. He arrived 10 to 12 minutes later, Mr. Walker cut his hair, and that is when Mr. Moffett arrived, at around 11 p.m., with an unidentified woman who waited outside the barbershop for him.

¶ 10    Mr. Walker testified that he had finished cutting Mr. Robinson's hair and was having a "heated conversation" with Mr. Moffett about a new real estate law, when a man named Eric walked in with another client of Mr. Walker's, known to him only as "J. Bird," a young man Mr. Walker did not know, and "some other little kids," although the "kids" soon left the barbershop. Mr. Walker later identified J. Bird as the defendant, Mr. Wilson. According to Mr. Walker, Eric was wearing a white T-shirt and J. Bird was wearing "[l]ike a powder blue jacket with blue sleeves, white T-shirt, some jeans, and a hat." Mr. Robinson likewise testified that a person named J. Bird,

whom he had only met once before, arrived shortly after 11 p.m. with two men Mr. Robinson knew as Eric and Reese. Mr. Robinson said that J. Bird was wearing a hoodie on the night of the shooting, though he could not recall what color it was, and may have also been wearing a skull cap.

¶ 11    J. Bird, Eric, and Reese sat down, and Mr. Walker began to cut Eric's hair while still talking to Mr. Moffett. Mr. Robinson testified that the man known as J. Bird then approached him and accused him of trying to rob him on a prior occasion. When Mr. Robinson denied the accusation, J. Bird stood up and drew a small black revolver from his waistband. Mr. Moffett, unarmed, attempted to intervene and, when he failed to comply with J. Bird's instruction to get back, J. Bird shot him in the stomach. Mr. Robinson testified that Mr. Moffett backed away, telling J. Bird it was "okay," but J. Bird shot him again in the shoulder and, when he fell to the ground, shot him a third time in the neck. All of this happened very quickly, according to Mr. Robinson, who insisted that he had remained seated nearby until the last shot was fired and thus had a clear line of sight. Only when Mr. Moffett fell to the ground did Mr. Robinson flee to the back of the barber shop. From there, he saw the man known as J. Bird and later identified as Mr. Wilson run out of the barbershop.

¶ 12    Mr. Walker provided a similar account of the shooting. According to him, J. Bird and Mr. Robinson were having "a heated conversation." J. Bird asked Mr. Robinson, "[w]here do I know you from?" and Mr. Robinson responded, "you know where the f*** you know me from." J. Bird then said, "you are the stupid mother f*** that tried to rob me, but your mother f*** gun got jammed." Alarmed by the intensity of the exchange, Mr. Walker asked the others if the two were being serious. According to him, Mr. Moffett "took it upon himself to get up out of the seat and approach J. Bird," telling him to "calm down with all that reckless talk." J. Bird then rose from his seat and drew a long-nose pistol, prompting Mr. Moffett to say "I ain't scared of no mother f***

gun." Mr. Walker was heading toward the back of the barbershop, away from the confrontation, when he heard the first shot. According to him, J. Bird shot Mr. Moffett in the leg, Mr. Moffett fell down and moved to the wall where he "received another shot," and then, as he lay on the floor screaming, "the last shots came." Mr. Walker testified that he and Mr. Robinson took shelter in the stairwell behind the shop.

¶ 13    Mr. Robinson testified that he waited a few minutes before leaving the barbershop, driving away in the Range Rover he had planned to return to Mr. Moffett. He did not get far before he was stopped by police, who told him that a Range Rover had been involved in a shooting. Mr. Robinson acknowledged that, scared and confused, he told the police that he had just been passing by, that he had heard the shots and saw people running but had not actually witnessed the shooting. After he was brought in overnight for questioning, however, he changed his story, ultimately identifying Mr. Wilson as the shooter from a photo array. The next day, the police took Mr. Robinson to testify before a grand jury, but Mr. Robinson was scared and left the courthouse without testifying. It was not until he was arrested in April 2007 that he finally testified before the grand jury.

¶ 14    Mr. Walker testified that immediately after the shooting, he called the police from the stairwell of the barbershop. He heard people fleeing the building and, when the commotion died down, went upstairs and saw Mr. Moffett on the floor by the front desk. When the police arrived, Mr. Walker told them "J. Bird did it." They brought him to the station and showed him a photo array, from which he was not able to make an identification. After telling the officers about a recent injury that J. Bird had suffered, however, a second photo array was prepared, and Mr. Walker identified Mr. Wilson as J. Bird from that array. Mr. Walker also identified the orange floppy hat and cell phone found near the barbershop's front desk as items belonging to Mr. Moffett.

¶ 15    On cross-examination, defense counsel explored the fact that, according to Mr. Walker, the

shooter had used his right hand. Mr. Walker agreed on cross-examination that J. Bird had been shot in the right hand a few weeks before the shooting at the barbershop and "hadn't been on the streets for a while." He explained, however, that J. Bird had "used both hands" to fire the gun, holding the gun in his right hand but using his left hand "to help it out." Mr. Walker could not recall specifically if he had told the police this but said he hoped he had.

¶ 16    A black-and-white surveillance video showing the outside of the barbershop on the night of the shooting was then played for the jury, which Mr. Walker was permitted to narrate. According to the trial transcripts, Mr. Walker was able to point out for the jury where in the video Eric could be seen entering the barbershop wearing a white T-shirt and jeans, followed by a second individual whom Mr. Walker did not know, J. Bird, and then a fourth person whom Mr. Walker also could not identify. Mr. Walker testified that "the same guy [he] didn't recognize" and "another person [he] didn't recognize who came in earlier" exited the barbershop a short time later. He indicated for the jury the individuals he referred to as "kids." Mr. Walker was apparently also able to point out for the jury the point in the video, just after the shooting took place, when J. Bird ran out with what Mr. Walker believed was a gun in his right hand, followed by Eric, who was still wearing a barber's cape, and "the other young man [Mr. Walker] didn't know." Sometime later, Mr. Walker identified Mr. Robinson exiting the building, followed by Leo, a homeless man who was allowed to sleep in the back office of the barbershop in exchange for helping to sweep up, and Mr. Walker himself.

¶ 17    The video, which this court has viewed, is choppy, very grainy, and difficult to make out. It depicts a number of individuals entering, exiting, and standing in front of the barbershop at various times but none of them have recognizable facial features, and the tape would have had little intrinsic value at trial absent Mr. Walker's contemporaneous identifications. There are also

several individuals depicted in the video who were not identified by Mr. Walker at trial, including a man who can be seen entering the barbershop approximately two minutes after the group Mr. Walker identified as Mr. Wilson, Eric, and the two unknown individuals entered the barbershop together.

¶ 18     Mr. Walker acknowledged that he had a 2001 conviction for burglary and a pending charge for forgery but testified that the assistant state's attorneys he had met with had made him no threats or promises in connection with his case. He acknowledged that, because he had been running to the back of the building, he had seen all but the first gunshot indirectly, through the barbershop's mirrors.

¶ 19                            3. Mr. Wilson's Statement to Police

¶ 20     Portions of Mr. Wilson's videotaped interrogation by the police on November 3, 2006, were also played for the jury. Initially, Mr. Wilson flatly denied that he was at the barbershop on the night of the shooting. After about 15 minutes, however, he acknowledged that he was there and explained what happened in much the same way it is now explained by the new witness that is the basis for his actual innocence claim. According to Mr. Wilson, the victim, Mr. Moffett, was a lifelong friend of his, someone he "ran with" and who had "practically raised" him.

¶ 21     Mr. Wilson told the police that a man with a shirt wrapped around his face had tried to rob the house where Mr. Wilson and a friend were staying some weeks before the shooting but that the would-be robber's gun had jammed. Mr. Wilson and his friend had wrestled the man to the ground and taken the gun, only recognizing as he broke free and ran off that it was Mr. Robinson, someone they both knew. On the night of the shooting, Mr. Wilson said that he was walking by the barbershop with "all [his] guys" when he saw Mr. Robinson inside with the barber. Mr. Wilson walked in and asked for a haircut, and Mr. Moffett struck up a conversation with him, saying that

his Range Rover was for sale. Mr. Wilson, in part to taunt Mr. Robinson, said he also had something for sale—a gun—and proceeded to describe the weapon they had confiscated from Mr. Robinson during the botched robbery. Mr. Wilson then came right out and asked Mr. Robinson, "[h]ey, don't I know you from somewhere?" to which Mr. Robinson responded, "s***, n***, you know where you know me from."

¶ 22    According to Mr. Wilson, "[n]ext thing you know [the] front door come in slamming" and a man that he and the others did not know entered and confronted Mr. Moffett. Mr. Wilson noticed this but was not paying attention to Mr. Moffett's altercation with this newcomer, as he was still in a confrontation with Mr. Robinson.

¶ 23    Mr. Wilson said "Geno [referring to Mr. Moffett] and this man they get to arguing and s***. Geno reach for his hip. Dude just shoot." Mr. Wilson told the police that a total of five shots were fired, but that as soon as the first shot rang out, everyone ran to the back of the barbershop. Mr. Wilson described the chaos that followed, saying, "motherf***s in there basically confused funna run into each other, n*** scared." According to him, everyone was "running back and forward" and "basically knowing they finna die." When they could see that the shooter had left, everyone ran back through the barbershop and out the front door of the building.

¶ 24    Mr. Wilson ran home, packed some clothes, and went to his sister's house in Indiana, partly because her boyfriend had been abusing her and she had asked him to come stay with her and partly because he just "panicked" and had no idea what was going on. Mr. Wilson said he saw his uncle, Joe, that night and told him, "man, Joe, I don't know what the f*** is going on. Somebody just came in and killed Geno. I think they was trying to kill us."

¶ 25    When asked what the shooter looked like, Mr. Wilson said, "I told y'all, I didn't really seen [*sic*] him like that." Mr. Wilson said the shooter was "a black guy," because "[a]in't no white

people in the neighborhood," but could give no further description.

¶ 26                    4. Witnesses for the Defense

¶ 27    The defense called Officer Michael Edens, who testified about another man being arrested with a revolver the night of the shooting, about 15 or 16 miles from the barbershop. The defense also called Officer Doherty, who spoke with Mr. Walker on the night of the shooting. Mr. Walker had told this officer that he only heard gunshots as he was running away to the basement of the barbershop.

¶ 28                    5. Jury Deliberations and Verdict

¶ 29    After deliberating for some time, the jury asked for and was shown both the surveillance video and Mr. Wilson's videotaped statement one additional time. The jury sent out a note sometime later asking, "[i]f we don't come with agreement, what then?" The court told them not to concern themselves with that yet and to continue their deliberations. The jury reached a verdict later that day, finding Mr. Wilson guilty of first degree murder and additionally finding that he personally discharged the firearm that proximately caused Mr. Moffett's death.

¶ 30                    6. Sentencing

¶ 31    At the time the presentence investigation (PSI) report in this case was prepared, Mr. Wilson was 21 years old. He was single and had five children, to whom he had made voluntary support payments. Mr. Wilson told the investigator that he had identified as a member of the Gangster Disciples from the ages of 14 or 15 to 21 but played no specific role within the gang's structure and had since then "left it alone" and "turned [his] life over to God."

¶ 32    According to the PSI report, Mr. Wilson never knew his father, who was shot and killed the year he was born. He and his four half-siblings were raised on the south side of Chicago by their mother, grandmother, and great-grandmother. Mr. Wilson told the investigator that his

mother was a drug addict throughout his childhood and, when he was 10 years old, the Department of Children and Family Services (DCFS) had placed him in the legal custody of his grandmother.

¶ 33    Mr. Wilson was enrolled in special education classes "for learning and behavioral problems" in the seventh and eighth grades. He recalled his grandmother taking him for a psychological evaluation when he was 14 or 15 years old but said that he was never diagnosed with a psychological disorder or prescribed any psychotropic medications.

¶ 34    In aggravation, the State argued that this was a shooting in a public place and that Mr. Wilson had two prior felony convictions. He had been sentenced to probation on a drug charge committed when he was 16 years old and to boot camp for illegally possessing a firearm when he was 17. The State asked the trial court to sentence Mr. Wilson to more than the minimum sentence.

¶ 35    Defense counsel argued in mitigation that Mr. Wilson had had a "tragic upbringing" and a history of special education placement. Counsel asked the court to impose only the minimum sentence, pointing out that with the firearm enhancement, that would already be 45 years in prison.

¶ 36    Having considered all of these factors, the trial court concluded that a sentence of 40 years, plus 25 years for the firearm enhancement, was necessary "to deter others from committing the same crime." We affirmed Mr. Wilson's conviction on direct appeal. *People v. Wilson*, No. 1-08-3493 (2011) (unpublished order under Illinois Supreme Court Rule 23).

¶ 37                              B. Mr. Wilson's *Pro Se* Petition

¶ 38    On August 23, 2012, Mr. Wilson filed a *pro se* postconviction petition arguing, among other things, that his trial counsel was ineffective for failing to investigate and call a man named Eric President, who, according to Mr. Wilson, would have testified that he arrived at the barbershop with Mr. Wilson and would have corroborated what Mr. Wilson told the police: that some other individual had entered the barbershop and shot Mr. Moffett.

¶ 39  Mr. Wilson attached an affidavit to his petition swearing that he "tried on variety occasions [*sic*] to retrieve an affidavit from Mr. Eric President that affiant was not the shooter" and that Mr. President "told [a] number of people from the neighborhood throughout the years that affiant was not the shooter." Mr. Wilson explained that he was "an indigent citizen of Illinois," he could not afford a private investigator, it was "very difficult *** to obtain an affidavit from Mr. Eric President," and he had "tried everyway [*sic*] to obtain an affidavit from Mr. Eric President."

¶ 40  The circuit court summarily dismissed Mr. Wilson's petition as frivolous and patently without merit. This court reversed. *People v. Wilson*, 2015 IL App (1st) 130879-U. We concluded that "[n]one of [Mr. Wilson's] factual allegations could be viewed as delusional or fantastic," the testimony he described, if presented at trial, would have corroborated what he had "consistently maintained" happened on the night of the shooting, and that testimony would have undercut the version of events testified to by Mr. Robinson and Mr. Walker. *Id.* ¶¶ 23, 25, 28. We noted both that no physical evidence connected Mr. Wilson to the shooting and that the testimony of the State's eyewitnesses was called into question by the assistant medical examiner, whose opinion, contrary to their testimony, was that the shots that killed Mr. Moffett had not been fired at close range. In sum, although "[t]he record in this case raise[d] questions as to the defendant's allegations of fact," it "[did] not 'positively' contradict them," making summary dismissal improper. *Id.* ¶ 30.

¶ 41                    C. Mr. Wilson's Amended Postconviction Petition

¶ 42  On remand, postconviction counsel was appointed to assist Mr. Wilson in amending or supplementing his petition. Only two claims in that petition are at issue in this appeal: (1) that new evidence uncovered by Mr. Wilson supports a claim of actual innocence and (2) that his *de facto* life sentence violates the proportionate penalties clause.

¶ 43                                    1. Actual Innocence

¶ 44     Mr. Wilson supplemented his amended petition with a claim of actual innocence, supported

by the June 24, 2016, notarized affidavit of a new witness, Lester Owens, who he claimed could

corroborate his account of what happened at the barbershop. Mr. Wilson submitted a handwritten

affidavit signed and notarized by Mr. Owens. In it, Mr. Owens explained that shortly before

11 p.m. on September 20, 2006, he was "driving down 72nd Dobson" on his way home when he

was stopped by a man named Danny Blackwell, someone Mr. Owens knew from the

neighborhood. Mr. Owens attested to the following sequence of events:

> "That Blackwell was standing in front of his house alone when he stopped me and
>
> asked me could I take him on 75th Vernon to meet an individual who owed him some
>
> money before that individual left.
>
> That I agreed to take him since the location wasn't too far from the neighbor hood.
>
> That Blackwell got into my car and I drove him to 75th Vernon, where I parked my
>
> car on the right hand side of 75th Street right across from a barber shop.
>
> That Blackwell stated that he would be right back and he exited my car and walked
>
> into the barber shop that was across the street from where I parked.
>
> That due to the large front window of the barber shop, which exposed the inside of
>
> the shop I was able to see the inside of the shop. And I seen that there was about six guys
>
> inside the shop but only one was getting his hair cut.
>
> That Blackwell entered the shop walked up to the barber and greeted him with a
>
> handshake then walked up to some other guy that was sitting to the right of the barber and
>
> greeted him with a handshake.
>
> That Blackwell then walked to the front of the shop and started talking to this guy

that was wearing like a brown shirt and an orange hat.

That I didn't know what they were talking about but like a minute into their conversation the guy with the orange hat struck Blackwell in the face with his hand.

That Blackwell immediately pulled out a black hand gun pointed at the guy wearing the orange hat and fired like two shots at the guy. When I seen the guy wearing the orange hat fall to the floor I immediately pulled off and left Blackwell at the barber shop."

¶ 45 Mr. Owens next saw Mr. Blackwell a few days later at a dice game at 68th Street and East End Avenue. Mr. Blackwell was upset that Mr. Owens had left him at the barbershop and the two "started exchanging insults." Mr. Owens said he "knew what [Mr. Blackwell] was capable of" and "didn't feel comfortable around him," so he walked to his car and started to leave. When he opened the car door, however, Mr. Blackwell "shot [him] in [his] left eye and ran off."

¶ 46 Mr. Owens explained that he never reported either shooting to the police because he "didn't want to be involved in the drama that came with it." He had no idea that someone else had been charged and convicted of murder in connection with the shooting at the barbershop until January 2016, when he met Mr. Wilson at the Pontiac Correctional Center. As to the details of that encounter, Mr. Owens averred:

"That during my conversation with Wilson about the law he informed me that he was wrongfully convicted for a murder that happened at a barber shop on 75th Vernon back in 2006. I asked him what month did it happen because I was curious to know after hearing the location and when he said September 20, I instantly knew what he was talking about."

Mr. Owens further explained that he is willing to come forward with the truth now because it does not "sit well" with him to know "that an innocent man is suffering for another man's action."

¶ 47 Mr. Wilson argued in his supplemented petition that Mr. Owens's affidavit constituted

newly discovered evidence because he had no idea that Mr. Owens witnessed the shooting until they met in prison years later, that it was not cumulative of other evidence at trial, and that it was material, as it "contradict[ed] the eyewitnesses that testified at trial, such that those witnesses' testimony would be more closely scrutinized."

¶ 48                    2. *De Facto* Life Sentence

¶ 49    Mr. Wilson also claimed in his amended postconviction petition that, as applied to him, a *de facto* life sentence of 65 years in prison violates the proportionate penalties clause of the Illinois Constitution. Mr. Wilson, who was 19 years old at the time of the offense for which he was convicted, cited *People v. Harris*, 2018 IL 121932, ¶ 48, decided nearly a decade after his sentencing, in which our supreme court recognized that emerging adults may, with proper factual support, assert youth-based, as-applied challenges to *de facto* life sentences. Because 18- and 19-year-olds "continue to display many of the same characteristics of immaturity and impulsivity as younger teenagers," Mr. Wilson argued, they should in proper cases receive the additional sentencing protections afforded to juvenile offenders that were established by the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012).

¶ 50    Mr. Wilson's appointed counsel presented detailed arguments for why Mr. Wilson's particular characteristics warranted such additional protections, stating in part:

> "Jaber was hyperactive, but medication was not prescribed. [Citation.] This is not to suggest that it necessarily should have been prescribed or that his grandmother, who adopted him in 1988 and made valiant efforts and provided a stable home, had any shortcomings. However, along with improper educational placement and insufficient services, it indicates that Jaber had challenges that were not adequately addressed, contributing to an often negative school experience, and that the impulsivity inherent in

youth was exacerbated in his case."

That Mr. Wilson's "impulsivity issues" had "quieted with time and treatment," counsel argued, demonstrated that he "was not and is not irredeemable, with no rehabilitative potential," and that his *de facto* life sentence was thus grossly unfair. Counsel noted that education opportunities had been withheld from Mr. Wilson in prison, "impacting his rehabilitative potential despite his best efforts to progress." He had participated in basic education and pre-GED programming but had not qualified for GED programming.

¶ 51 Mr. Wilson also provided over 140 pages of attachments in support of his proportionate penalties claim, including affidavits, school evaluations, DCFS records, and certificates of achievement he earned while in prison. A psychological evaluation conducted when Mr. Wilson was in fourth grade stated that he had been "expelled from at least one school due to his aggressive behavior" and was "frequently cited for lack of self-control." The psychologist noted that although his IQ was above-average and, with the exception of spelling, he was performing at or above a grade-appropriate level, his "adaptive functioning" was not what it should be. With limited coping skills, Mr. Wilson dealt with his anxiety and depression "through aggressive acting out." He was "easily stimulated," often felt "overwhelmed by emotions," and had poor judgment because he would frequently "base his decisions totally on these emotions." Although family treatment was deemed critical, there is no indication in the record that such treatment was ever provided.

¶ 52 School report cards indicated that Mr. Wilson was "acting out in class" and needed to improve in areas like "[e]xercises self-control," and "[m]akes appropriate decisions independently." And in a DCFS education report, Mr. Wilson's fifth-grade teacher noted that he had been "evaluated as mildly cognitively delayed" and was enrolled in special education classes.

¶ 53 Mr. Wilson's grandmother submitted an affidavit confirming that Mr. Wilson's mother,

now deceased, had used drugs during his childhood, resulting in DCFS involvement and his grandmother eventually adopting him. She further stated that, as a child, Mr. Wilson "was believed to have some cognitive delay and to be hyperactive." He saw a therapist at his elementary school but received no other treatment or therapy. She eventually arranged for him to attend a private middle school "that was safer and accommodated his hyperactivity with a flexible attendance schedule." He attended special education classes in ninth and tenth grade, but his grandmother stated that this "was a negative experience" because the classes "were not tailored to his needs."

¶ 54    Mr. Wilson confirmed this information in his own affidavit, adding that he had been in "the slow learners' class" in elementary school. Mr. Wilson claimed to have good relationships with his children, who visited him, and whom he kept in touch with by sending them letters and cards. He was especially close to his oldest daughter, Anaya, who was then a 16-year-old high school student and who visited him on a regular basis.

¶ 55    Mr. Wilson also averred that treatment while in prison had allowed him to begin to overcome some of the difficulties he faced, stating:

> "Mental health groups or classes are offered to the residents of my wing and I attend three times a week. I am now being helped by prescribed medication for sleeping and anxiety. This has helped me to become more stable and I have made progress in impulse control and in dealing more calmly and reasonably with difficult situations."

Attached to his amended petition were a number of certificates of achievement he earned while in prison for completing courses in grief and loss, victim impact, lifestyle redirection, problem solving, anger management, and conflict resolution.

¶ 56    Finally, Mr. Wilson attached the September 2017 testimony—spanning some 70 pages—of Dr. Laurence Steinberg in *Cruz v. United States*, No. 11-CV-787, 2018 WL 1541898 (D. Conn.

Mar. 29, 2018), *vacated*, 826 F. App'x 49 (2d Cir. 2020), a federal district court case in which an 18-year-old offender argued that his sentence of mandatory life in prison without parole imposed absent *Miller*'s protections violated the eighth amendment of the United States Constitution. Dr. Steinberg, a professor of psychology at Temple University who specializes in adolescence, was the lead psychologist on the amicus briefs submitted by the American Psychological Association in *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller*, 567 U.S. 460. Dr. Steinberg testified that compared to adults, adolescents—whom he defined as individuals from 10-21 years of age—are "more impulsive," "more prone to engage in risky and reckless behavior," "more oriented toward the present and less oriented toward the future," and more "susceptible to the influence of other people." Likening the limbic system or emotional center of the brain to the accelerator and the prefrontal cortex to the brakes, he explained that during adolescence, the limbic system is "increasingly easily aroused" and capable of overwhelming the prefrontal cortex, which has not yet fully developed. According to Dr. Steinberg, there is a general consensus in the scientific community that the data supports these conclusions. Although he acknowledged on cross-examination that more studies needed to be done specifically looking at individuals over the age of 18, he explained that patterns in risk-taking and emotional maturation have allowed researchers to construct theoretical models of behaviors in the 18 to 21 age group that demonstrate a continuation of adolescent risk-taking.

¶ 57                                3. Circuit Court Ruling

¶ 58    The circuit court granted the State's motion to dismiss Mr. Wilson's petition. On the actual innocence claim, the court found it quite improbable that Mr. Owens "just happen[ed] to have remembered on that particular day being with somebody who he claims was named Danny Blackwell" and noted that Mr. Owens had not explained how it was that he came to be incarcerated

at the same time as Mr. Wilson or provided any details concerning their encounter. Understanding that it could make no credibility determination at the second stage, however, the court took pains to explain that its ruling was based not on the fact that Mr. Owens's account was unbelievable but on its inconclusive nature:

"I am absolutely aware that it is not proper for the Court to make any credibility determinations regarding Mr. Owens or his affidavit at this point. I'm incapable of doing so by virtue of the fact that he's not present. This is the so-called second stage hearing, it is not an evidentiary hearing, can't make credibility determinations without someone's testimony until you actually hear and see them testify when they're subject too [*sic*] direct and cross-examination. I would note, however, in no uncertain terms that the circumstances set forth by Mr. Owens in his affidavit lack any conclusiveness whatsoever regarding his claim that Mr. Wilson is innocent.

Consequently—his actions. Consequently, the Court will grant the State's motion with respect to that issue as well ***."

¶ 59　On the as-applied proportionate penalties claim, the court recounted the facts of *People v. House*, 2019 IL App (1st) 110580-B, and *People v. Leon Miller*, 202 Ill. 2d 328 (2002), pointing out that, unlike the defendants in those cases, Mr. Wilson had not served as a mere lookout. If the "40-year cutoff" announced in *People v. Buffer*, 2019 IL 122327, could apply, through the proportionate penalties clause, to individuals over the age of 18, then in the court's view "this circumstance is not it." The court dismissed that claim as well.

¶ 60　　　　　　　　　　　　　　　II. JURISDICTION

¶ 61　The circuit court dismissed Mr. Wilson's amended postconviction petition on September 19, 2019, and Mr. Wilson timely filed a notice of appeal from that ruling the same day. We have

jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 606 (eff. July 1, 2017) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 62                                    III. ANALYSIS

¶ 63     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) establishes procedures by which an incarcerated criminal defendant may challenge his conviction or sentence based on a substantial deprivation of his state or federal constitutional rights. *Id.* § 122-1(a)(1); *People v. Caballero*, 228 Ill. 2d 79, 83 (2008). A postconviction proceeding is a collateral attack on the trial court proceedings. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Its scope is limited to constitutional issues that were not, and could not have been, previously adjudicated. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005).

¶ 64     Postconviction proceedings occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines, without any input from the State, whether the defendant's petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Gaultney*, 174 Ill. 2d at 418. To survive dismissal at this stage, a petition need only present the "gist" of a constitutional claim. *Gaultney*, 174 Ill. 2d at 418. At the second stage, the circuit court may appoint counsel to represent the defendant and file an amended petition, and the State must either answer or move to dismiss the petition. 725 ILCS 5/122-4, 122-5 (West 2018); *Gaultney*, 174 Ill. 2d at 418. "Where the State seeks dismissal of a post-conviction petition instead of filing an answer, its motion to dismiss assumes the truth of the allegations to which it is directed and questions only their legal sufficiency." *People v. Miller*, 203 Ill. 2d 433, 437 (2002). A petition should be dismissed at the second stage when its allegations of fact, "liberally construed in favor of the petitioner and in light of the original trial record," fail to make a "substantial showing" of a

constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). If such a showing is made—*i.e.*, if support for the allegations exists in the record or in accompanying affidavits—the petition advances to a third-stage evidentiary hearing on the merits. 725 ILCS 5/122-6 (West 2018); *People v. Silagy*, 116 Ill. 2d 357, 365 (1987).

¶ 65    In determining whether to grant a third-stage hearing, the circuit court takes all well-pleaded facts in the petition and in any accompanying affidavits as true, unless they are positively rebutted by the record (*People v. Evans*, 186 Ill. 2d 83, 89 (1999)), and does not make findings of fact or credibility determinations (*People v. Childress*, 191 Ill. 2d 168, 174 (2000)). The court's concern at this stage is thus solely with the "legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle [the] petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 66    We review the dismissal of a postconviction petition at the second stage *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 67                          A. Mr. Wilson's Claim of Actual Innocence

¶ 68    We first consider Mr. Wilson's claim of actual innocence, based on the eyewitness account of Mr. Owens that someone other than Mr. Wilson shot and killed Mr. Moffett at the Buchanan Barbershop. "Courts may consider a freestanding claim of actual innocence in a post-conviction proceeding if the claim is based on newly discovered, material, and noncumulative evidence that the defendant is innocent of the crime for which he has been tried, convicted, and sentenced." *People v. Harris*, 206 Ill. 2d 293, 301 (2002). "A defendant is only entitled to relief on [a] claim of actual innocence if the evidence is of such a conclusive character that it would probably change the result of retrial." *Id.*

¶ 69    Here, the State does not dispute that Mr. Owens's affidavit is material and noncumulative.

Its position is that the affidavit cannot be considered newly discovered and, even if it could, the circuit court correctly concluded that the facts relayed in the affidavit are not of such a conclusive nature that, if proved, they would have any effect on the result of a retrial.

¶ 70   The State argues that Mr. Owens's affidavit is not "newly discovered" because "[w]hile Owens himself may have been unknown to [Mr. Wilson] as a source, the facts contained in his affidavit were already known to [Mr. Wilson] long before trial." (Emphasis added.) We do not accept this attempt to equate knowledge by a defendant that he is not guilty with knowledge of evidence that could help the defendant convince a jury of this fact. We explained this in *People v. Jackson*, 2018 IL App (1st) 171773, stating:

> "We *** reject the notion, *** that we should focus on whether the *information* [the averring witness] now offers is newly discovered. The trial court pointed to the fact that it is not new information to [the defendant] that he was not the shooter and that the police were trying to coerce witnesses into saying that he was. Our supreme court has made clear that a claim of actual innocence based on the testimony of an additional eyewitness previously unknown to the defendant constitutes a new 'claim' of actual innocence. [Citation]. To hold otherwise would prevent innocent defendants, necessarily aware of their own innocence, from ever asserting claims of actual innocence based on newly discovered evidence supporting their exoneration." (Emphasis in original.) *Id.* ¶ 75.

¶ 71   Evidence is newly discovered if it was "not available at *** trial and *** could not have [been] discovered sooner through [due] diligence." *People v. Jarrett*, 399 Ill. App. 3d 715, 723 (2010). Here, Mr. Wilson asserted that he was unaware that anyone outside the barbershop witnessed the shooting. Unlike the occupants of the barbershop, who were known to Mr. Wilson or identified by other witnesses, at least by nickname, Mr. Owens was not referred to anywhere in

the evidence adduced at trial. Accordingly, we find Mr. Wilson has carried his burden of demonstrating that Mr. Owens's affidavit and any testimony he would offer in this matter is newly discovered.

¶ 72    The State next argues, as the circuit court concluded when it dismissed Mr. Wilson's actual innocence claim, that Mr. Owens's affidavit is not "of such conclusive character that it [would] probably change the result on retrial." In support of this argument, the State reminds us that when considering Mr. Wilson's claim of first-prong plain error on direct appeal, we concluded that the evidence against him at trial was "overwhelming." *Wilson*, slip order at 8. But at trial there were two eyewitnesses with generally consistent accounts of what happened that conflicted entirely with the uncorroborated account Mr. Wilson gave to police. The corroborating testimony of another witness—an outsider who was neither the friend nor the enemy of anyone in the barbershop and who had a clear view of what took place the night Mr. Moffett was shot—would have done much to level the playing field for Mr. Wilson, forcing the jury to make a much different and potentially more difficult credibility determination. Also, as noted above, these were jurors that at one point asked the court what would happen if they could not come to an agreement.

¶ 73    As our supreme court has instructed, when considering the conclusiveness of newly discovered evidence, the question is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 48. In making this assessment, we must take all well-pleaded facts in Mr. Wilson's petition and in Mr. Owens's sworn affidavit that are not positively rebutted by the record as true. *Evans*, 186 Ill. 2d at 89.

¶ 74    On this point we find *People v. Brooks*, 2021 IL App (4th) 200573, cited by Mr. Wilson as supplemental authority on appeal, to be instructive. The petitioner in *Brooks* alleged that his trial

counsel failed to investigate or call a witness who would have testified that she possessed a text message from another individual, in which that person admitted to having committed the murder for which the petitioner had been convicted. *Id.* ¶ 3. The circuit court dismissed the petition at the second stage, finding the affidavit contained inadmissible hearsay. *Id.* ¶ 60. This court reversed, on the basis that the rules of evidence do not apply at the second stage of postconviction proceedings and the affidavit thus had to be taken as true. *Id.* ¶¶ 61.

¶ 75    Although we agree with the State that the court's focus in *Brooks* was on evidentiary matters (*id.* ¶ 42), the court also discussed at length what it means to take the assertions made in an affidavit as true. In doing so, the court adopted the following analysis from Justice Ellis's dissent in *People v. Simms*, 2020 IL App (1st) 161067:

" 'What does it mean to take an affidavit *as true*? Do we merely assume that the affiant would testify consistently with the affidavit at a new trial? Or must we assume that a reasonable juror, hearing the affiant's testimony at a new trial, would *believe* it—which is just to say, take it as true?

* * *

At this initial stage, we are required to accept "[a]ll well-pleaded factual allegations"—including those set forth in [the new witness's] affidavit—as true. [Citation.] If taking [that] affidavit testimony *as true* means anything at all, it must mean that a juror, hearing from [the new witness] at a hypothetical retrial, would *believe* his testimony. (To "believe" just means "to accept something as true, genuine, or real." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/believe (last visited June 3, 2019)). *** We then ask whether it is more likely than not that no reasonable juror, hearing *and believing* this evidence, alongside all the other evidence presented at trial,

- 23 -

could convict defendant.' " (Emphases in original.) *Brooks*, 2021 IL App (4th) 200573, ¶ 44 (quoting *Simms*, 2020 IL App (1st) 161067, ¶¶ 53-57 (Ellis, J., dissenting)).

¶ 76    Here, we simply cannot agree with the State that if taken as true, Mr. Owens's testimony, which provides significant corroboration for Mr. Wilson's unwavering insistence that someone else was the shooter in this case, "would not have had any impact on the trier of fact's determination." An experienced prosecutor would certainly want to rigorously test the accuracy of Mr. Owens's recollections and explore the fortuitous circumstances under which he and Mr. Wilson met. But that is part of helping the factfinder to determine credibility, a task our supreme court has made clear is strictly reserved for third-stage evidentiary hearings. *Robinson*, 2020 IL 123849, ¶ 61. The possibility that Mr. Owens might not be as credible as the State's witnesses is simply not a basis for dismissal at the second stage.

¶ 77    The physical evidence in this case—including the recovered bullets indicating that the murder weapon was a revolver and the presence of blood on the desk and carpet where the State's witnesses testified Mr. Moffett were shot—is indeed consistent with the accounts given by those witnesses, but it is also consistent with the alternative account given by Mr. Wilson and now by Mr. Owens. The State also inflates the helpfulness of the surveillance video, which we have reviewed ourselves. It is difficult to make out many of the things Mr. Walker told the jury he saw in that video, including a gun in the hand of the figure he identified as Mr. Wilson. And individuals are present in the video that he did not account for. The only thing that the video clearly establishes is that a number of people came in and out of the barbershop on the night of the shooting, which is fully consistent with the accounts given by Mr. Wilson and Mr. Owens. The State insisted at oral argument in this court that Mr. Owens's statement that he parked his car across the street from the barbershop is refuted by the surveillance video, which does not clearly depict anyone crossing

the street directly in front of the barbershop. As defense counsel correctly noted, however, the surveillance footage was taken at an angle. The full width of the street is not visible. Nor is a great deal of the length of the street beyond the barbershop. It is at least possible that one of the unidentified individuals in the video exited a vehicle on the other side of the street and crossed the street outside of the camera's field of view before entering the barbershop. Mr. Owens's affidavit is thus not positively rebutted by the record.

¶ 78     The State also insists that Mr. Owens's affidavit lacks necessary details, like what Mr. Blackwell looked like or was wearing and faults Mr. Wilson for not attempting to identify which of the otherwise unidentified individuals in the surveillance video is Mr. Blackwell. These also may be proper areas of inquiry for cross-examination at an evidentiary hearing. This is not, however, a situation where a completely uncorroborated and perfunctory affidavit proclaiming the defendant's innocence is offered up by an all-too-convenient jailhouse witness. Mr. Owens's affidavit provides details regarding when and how he encountered Mr. Blackwell on the night of the shooting and an accurate description of the barbershop and its occupants, including the fact that the victim was wearing a brown shirt and an orange hat. Mr. Owens goes on to explain why he had a good reason to remember the events in question. When he ran into Mr. Blackwell just a few days later, Mr. Blackwell was angry that Mr. Owens had left him at the barbershop and shot Mr. Owens in the left eye in retribution. The Department of Corrections' prisoner database, which we may take judicial notice of (*People v. Goods*, 2016 IL App (1st) 140511, ¶ 56), confirms that Mr. Owens has a blind left eye, a disability that is also apparent from his prison photograph. See *Internet Inmate Status*, Ill. Dep't of Corr., https://www.idoc.state.il.us/subsections/search/ inms_print.asp?idoc=M15274 (last visited Jan. 18, 2022) [https://perma.cc/T8SF-C7Q5]. Nor, as defense counsel pointed out at argument, is this a case where the newly discovered evidence

conflicts with a previous confession. Over the course of the 34-minute interrogation video introduced at trial, Mr. Wilson never once departed from his insistence that some other man who entered the barbershop that night was the shooter.

¶ 79    Nor has he departed from it since. We have examined the account that Mr. Wilson provided in his original petition about what he believed Mr. President would have testified to if called at trial and that account is consistent with both Mr. Wilson's statement to the police and Mr. Owens's affidavit. For example, Mr. Wilson's assertion that Mr. President would have said the shooter entered the barbershop and yelled at Mr. Moffat, "Geno where's that s***? Give me that s***?" tracks with Mr. Owens's statement that Mr. Blackwell asked for a ride to the barbershop because he wanted to confront "an individual who owed him some money before that individual left." It is also consistent with the testimony at trial that Mr. Moffat was at the barbershop to collect his Range Rover and laptop and that he was trying to sell the Range Rover.

¶ 80    It is true that in order to believe Mr. Owens, a jury would have to conclude that Mr. Walker and Mr. Robinson were either mistaken or lying. But as our supreme court recently made clear, newly discovered evidence is not positively rebutted by the record simply because it conflicts with other evidence. *Robinson*, 2020 IL 123849, ¶ 60. It must instead "be clear from the trial record that *no* fact finder could ever accept the truth of that evidence," such as where the new evidence "is affirmatively and incontestably demonstrated to be false or impossible." (Emphasis added.) *Id.*

¶ 81    There are reasons, based on this record, that a jury could reject the identification of Mr. Wilson as the shooter by the State's witnesses. There was evidence, for example that when the first shot was fired, Mr. Walker was already headed to the back of the barbershop and may not have seen who fired the shots. Mr. Wilson had accused Mr. Robinson of robbing him and Mr. Robinson therefore could have been motivated to falsely accuse Mr. Wilson of this murder. Or Mr.

Walker and Mr. Robinson might have had some concerns, as Mr. Owens did, about "what [Mr. Blackwell] was capable of" and decided it would be better to name Mr. Wilson as the shooter than to name Mr. Blackwell.

¶ 82    The State is quite correct that the requirements of an actual innocence claim are "extraordinarily difficult to meet" and courts thus "rarely grant postconviction petitions based on claims of actual innocence." *People v. Coleman*, 2013 IL 113307, ¶ 94. But to advance a petition to the third stage does not mean that the petition will necessarily be *granted*, only that the evidence supporting the petition should be appropriately tested and assessed. We reverse the circuit court's dismissal of Mr. Wilson's actual innocence claim and remand for such an assessment at a third-stage hearing.

¶ 83                    B. Mr. Wilson's As-Applied Proportionate Penalties Claim

¶ 84    Mr. Wilson's second claim is that, as applied to him, a 65-year *de facto* life sentence for a crime committed when he was just 19 years old violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). In support of this argument, Mr. Wilson relies on recent caselaw governing the sentencing of juvenile and young-adult offenders, caselaw that without a doubt has evolved considerably since he was sentenced in 2008.

¶ 85    In *Miller*, 567 U.S. 460, the United States Supreme Court established a new substantive right: exemption, in all but the rarest of circumstances, from sentences of life in prison without the opportunity for parole for juvenile offenders. As the Court explained in *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016), a *Miller*-compliant sentencing hearing is designed to ensure that the defendant is not one of those "rare juvenile offender[s] who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified."

¶ 86    *Miller* defined juvenile offenders narrowly, however, based on societal norms, as those

under the age of 18 at the time of their crimes. *Miller*, 567 U.S. at 465. For this narrow group—and excepting the possibility that a juvenile's crimes might in rare cases reflect "irreparable corruption"—the Court determined that a life sentence without the opportunity for parole is categorically cruel and unusual under the eighth amendment. (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at 194-95. Our own supreme court has held that this is true regardless of whether the life sentence is actual or *de facto*, mandatory or discretionary. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10; *People v. Holman*, 2017 IL 120655, ¶ 40. In arriving at and in applying this new substantive rule, "the Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58.

¶ 87    In recent years, however, our supreme court has acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (noting that a defendant, who was 19 years old at the time of his crime, could not bring such a claim for the first time on direct appeal but was "not necessarily foreclosed" from asserting it in postconviction proceedings); *Harris*, 2018 IL 121932, ¶ 48 (likewise concluding that the as-applied, youth-based sentencing claim of a defendant who was 18 at the time of his crime was "more appropriately raised" in postconviction proceedings). In doing so, the court has accepted the possibility that a young-adult offender may be able to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." See *People v. Klepper*, 234 Ill. 2d 337, 348-49

(2009) (stating what is required to succeed on a proportionate penalties claim).

¶ 88    While this appeal was pending, the court issued its decision in *People v. House*, 2021 IL 125124, cited by Mr. Wilson as supplemental authority, and commented on the role of second- and third-stage proceedings where such fact-intensive claims are asserted. *House* also involved the second-stage dismissal of a youth-based proportionate penalties claim asserted by a 19-year-old offender. *Id.* ¶ 8. This court reversed the dismissal and remanded for a new sentencing hearing, concluding that further postconviction proceedings were unnecessary. *Id.* ¶ 12. Our supreme court disagreed, clarifying that such a claim must be based on "evidence relating to how the evolving science on juvenile maturity and brain development applie[d] to [the defendant's] specific facts and circumstances." *Id.* ¶ 29. Because the factual record required additional development, the court remanded the case to the circuit court for further second-stage proceedings. *Id.* ¶ 32.

¶ 89    Mr. Wilson argues that, unlike the petition in *House*, his amended petition presents considerable evidence that, at age 19, his individual characteristics rendered him more like a juvenile than an adult. We agree. Mr. Wilson's petition and the attachments supporting it make a connection between the applicable science and his own characteristics as a 19-year-old offender.

¶ 90    Dr. Steinberg's testimony under oath in an unrelated case was that until young adults are 22 or 23 they often lag behind in their ability to make good decisions while emotionally stressed. The evidence concerning Mr. Wilson's specific background tracks with these findings. As early as fourth grade, a trained psychologist noted that he was "frequently cited for lack of self-control" and aggressive behavior. Although Mr. Wilson was capable of performing at or above his grade level, he had poor "adaptive functioning." Mr. Wilson lacked coping skills to face his anxiety, depression, and fear that he could not trust the adults in his life or rely on a safe home environment. He responded through "aggressive acting out." He was "easily stimulated" and "overwhelmed by

emotions" and exhibited poor judgment because he would often "base his decisions totally on these emotions." School report cards and evaluations in later years substantiate these findings. Treatment was recommended but apparently never provided. Instead, Mr. Wilson was determined to be "mildly cognitively delayed." He was placed in the "slow learners' class" in elementary school and in special education classes in ninth and tenth grade, but according to his grandmother, these classes were not tailored to his needs.

¶ 91    When asked by the panel at oral argument what *would* be sufficient to proceed to a third-stage evidentiary hearing, if we were to hold that the facts alleged in Mr. Wilson's petition and the documents he attached in support of those allegations are insufficient, the State found it "difficult to say." One of the State's primary arguments is that the most helpful evidence of Mr. Wilson's cognitive delay, inability to maintain self-control, and tendency to be overwhelmed by emotion date from his early adolescence. The State urges us to presume, absent any support in the record, that Mr. Wilson overcame these challenges and, by the time he was 19 years old, was fully the equivalent of a mature adult. In our view, however, the specific findings made by a child psychologist when Mr. Wilson was in fourth grade and by Mr. Wilson's fifth-grade teacher paint a picture of difficulties that would persist if not addressed. The psychologist specifically stated that family treatment was "critical." Nothing in the record suggests that treatment was provided. The likelihood that the cognitive delay and lack of self-control Mr. Wilson experienced persisted into his late adolescence and early adulthood is further evidenced by the fact that Mr. Wilson was enrolled in special education classes as late as tenth grade. Defense counsel also drew our attention at oral argument to a Chicago Public Schools student information report, last updated on November 1, 2004, when Mr. Wilson was 18 years old, that still referred to him as "educable mentally handicapped." Since the psychological evaluation done in fourth grade reported that he had an

above-average IQ, it seems unlikely that the school's later categorization of Mr. Wilson as "educable mentally handicapped" was the result of a low IQ. The materials attached to Mr. Wilson's petition suggest that ongoing developmental delays in the areas of self-control and the regulation of emotions may have been what kept Mr. Wilson in special education classes through at least November 2004.

¶ 92    The personal growth that Mr. Wilson has shown while incarcerated also indicates that his earlier difficulties reflected the transient characteristics of youth rather than a more permanent cognitive condition. He renounced his prior gang affiliation and has completed courses in grief and loss, victim impact, lifestyle redirection, problem solving, anger management, and conflict resolution. In his affidavit he stated that he attends mental health group sessions three times a week, he has been prescribed medication for sleeping and anxiety, that these things have helped him "to become more stable," and that he has "made progress in impulse control and in dealing more calmly and reasonably with difficult situations." He has good relationships with his children and, in particular, visits with and writes regularly to his 16-year-old daughter.

¶ 93    We reject the State's argument, based on *Holman*, 2017 IL 120655, ¶ 47, that we may not consider these facts regarding the improvements Mr. Wilson has made post-incarceration because any inquiry into application of the sentencing factors must be "backwards-looking." As we explained in *People v. Zumot*, 2021 IL App (1st) 191743, ¶¶ 33-34, post-sentencing conduct is not being considered here as part of an inquiry into the sentencing judge's application of the *Miller* factors "but rather as evidence that may be relevant to whether *Miller* applies in the first place to this particular 19-year-old offender."

> "Where, as here, the initial inquiry is whether a young adult over the age of 18 may have
>
> exhibited the characteristics of a juvenile because he possessed rehabilitative potential

incompatible with the imposition of a life sentence, his post-sentencing conduct may be relevant to such a determination and, if so, should be considered." *Id.* ¶ 34 (" 'if, and only if, the young adult makes [the showing that he is the equivalent of a juvenile] then the trial court goes on to consider whether the initial sentencing hearing complied with *Miller*.' " (quoting *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 52)).

¶ 94    And unlike the petitioner in *People v. Coty*, 2020 IL 123972, also relied on by the State, the evidence supporting Mr. Wilson's petition suggests that his cognitive delay was the result of transient juvenile immaturity and not simply lowered or impaired cognition. In *Coty*, our supreme court rejected the *Miller*-based challenge of a 46-year-old intellectually disabled adult, on the basis that his permanent disability rendered him less culpable but also "less likely to be rehabilitated and thus more likely to reoffend." *Id.* ¶ 42. Nothing in the record suggests that that Mr. Wilson's struggles with impulse control are of a similarly permanent nature. Whether the State can successfully argue that they are, following an evidentiary hearing, remains to be seen.

¶ 95    The State's other arguments for why Mr. Wilson's proportionate penalties claim was properly dismissed are, in our view, equally without merit. Our supreme court held in *Buffer*, 2019 IL 122327, ¶ 41, that for purposes of applying the rule in *Miller*, a *de facto* life sentence is any sentence greater than 40 years. The State suggests in a footnote that because the *Buffer* court "was only focused on juveniles," there could conceivably be some other, as yet unknown, limit for when a lengthy term-of-years sentence imposed on a young adult should be deemed a *de facto* life sentence. If so, however, we fail to see why that line would be drawn at anything *beyond* the 40 years established in *Buffer*. A young-adult offender, after all, will reach his anticipated life expectancy sooner, not later, than a juvenile offender.

¶ 96    We likewise reject the State's argument that young-adult offenders cannot claim *Miller*-

based protections where their sentences, like Mr. Wilson's, were discretionary rather than mandatory. Our supreme court eliminated this distinction for juveniles in *Holman*, 2017 IL 120655, ¶ 40, where it held that "*Miller* applies to discretionary sentences of life without parole for juvenile defendants." We see no reason that this distinction should have any more validity for a young adult making a proportionate penalties claim than it would for a juvenile. See *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 18.

¶ 97 We are aware of recent language from our supreme court in *People v. Jones*, 2021 IL 126432, ¶ 26, and *People v. Dorsey*, 2021 IL 123010, ¶ 41, questioning what it had said in *Holman*, and suggesting that it might resurrect the mandatory/discretionary dichotomy for juveniles or apply that dichotomy for as-applied challenges under the proportionate penalties clause for young adults. However, even if this distinction does apply, it should not impact Mr. Wilson's ability to make a claim here. The minimum sentence Mr. Wilson could have received was 45 years, which as our supreme court recognized in *Buffer* is a *de facto* life sentence. The trial court in this case plainly had no discretion to sentence Mr. Wilson to anything less than life in prison. As we recognized in *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 130, a life sentence can only be considered discretionary "where the trial court had at its disposal a minimum sentence of less than 40 years yet decided to impose a sentence in excess of that term." Thus, Mr. Wilson received a mandatory *de facto* life sentence, and any distinction between mandatory and discretionary life sentences has no applicability to his claim.

¶ 98 The State's argument that *Miller* cannot apply where Mr. Wilson, unlike the petitioner in *House*, "was not just a peripheral actor, but was the shooter," is furthermore one that our supreme court has now expressly rejected. See *House*, 2021 IL 125124, ¶ 31 (explaining that the proper analysis hinges on the "development of the record in the trial court, not whether the challenge is

raised on a collateral proceeding or on appeal, *or whether the petitioner was a principal rather than an accomplice in the crime*" (emphasis added)). This recent clarification by the court also diminishes the persuasive value of *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 30, and *People v. Handy*, 2019 IL App (1st) 170213, cases the dissent cites as examples of this court rejecting attempts "to extend *Miller* via the proportionate penalties clause to young adults *for crimes they personally committed*" (see *infra* ¶¶ 112-16).

¶ 99    Finally, we reject the State's argument, accepted by the dissent, that the trial court in this case did in fact consider the *Miller* factors when it sentenced Mr. Wilson in 2008—years before *Miller* or *Harris* would be decided—simply because *some* information touching on those factors was included in the PSI report submitted at sentencing. The trial court knew from the PSI report in this case and from defense counsel's arguments in mitigation that Mr. Wilson, who was 21 years old at the time of sentencing, had had a "tragic upbringing," in that he never knew his father, was raised by his mother until the age of 10, and was thereafter placed in the care of his grandmother when his mother's substance abuse problems escalated. The court knew that Mr. Wilson had a history of special education placement and had been subjected to a psychological evaluation when he was 14 or 15 years old but was never diagnosed with a psychological disorder or prescribed any psychotropic medications. *See supra* ¶¶ 31-36. That is all.

¶ 100   The State does not dispute that numerous allegations and documents elaborating on this history were presented to the court for the first time in support of Mr. Wilson's postconviction petition, including affidavits, school evaluations, DCFS records, and certificates of achievement he earned while in prison. These materials, which are detailed above (see *supra* ¶¶51-56), are also relevant to the *Miller* factors, which include both a defendant's "particular immaturity" and "prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 101   As we have noted before, "being aware of evidence relevant to the *Miller* factors is wholly distinct from considering those factors as mitigating, or carefully considering the prospect of a defendant's rehabilitative potential." (Internal quotation marks omitted.) *Zumot*, 2021 IL App (1st) 191743, ¶ 40. The trial court in this case had some relevant information at its disposal when it sentenced Mr. Wilson, but nothing like the amount Mr. Wilson has already gathered or could gather for a *Miller* hearing to show that he was not one of those rare juveniles whose crime reflects irreparable corruption, *i.e.*, "who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at 208. We simply cannot conclude that Mr. Wilson received a *Miller*-compliant sentencing hearing under these circumstances.

¶ 102   We reverse the circuit court's dismissal of Mr. Wilson's youth-based proportionate penalties claim and remand for a third-stage hearing.

¶ 103                                    IV. CONCLUSION

¶ 104   For the above reasons, we find that when liberally construed in his favor and taken as true, the facts set out in Mr. Wilson's petition and supporting documentation make a substantial showing of constitutional violations requiring a third-stage evidentiary hearing. On remand, the circuit court should first hold a hearing on Mr. Wilson's claim of actual innocence. If a new trial is ordered, Mr. Wilson's sentencing arguments will be moot. If a new trial is not ordered, an evidentiary hearing should then be held on his youth-based proportionate penalties claim.

¶ 105   Reversed and remanded with directions.


¶ 106   J. Pierce, dissenting in part.

¶ 107   The majority has found that petitioner's proportionate penalties challenge should be

advanced to the third stage for an evidentiary hearing, should the circuit court find that petitioner's actual innocence argument fails. I respectfully disagree, as petitioner was 19 years old at the time he shot and killed the victim in this case, and the mitigation evidence in support of his claim that he be treated as a juvenile was known to him at the time of his trial and was largely cumulative to the evidence included in the PSI.

¶ 108   The Illinois proportionate-penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A defendant prevails on a proportionate penalties claim where he shows "that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). An imprisonment sentence greater than 40 years imposed on a juvenile constitutes a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 109   Petitioner raised an as-applied, youth-based challenge to his sentence relying on the principles articulated in *Miller* to claim that his sentence "is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *Klepper*, 234 Ill. 2d at 348. By definition, an "as applied" challenge "is dependent on the particular circumstances and facts of the individual defendant or petitioner." *People v. Thompson*, 2015 IL 118151, ¶ 37.

¶ 110   In this case, petitioner was convicted of shooting and killing Moffett. He received a discretionary sentence of 65 years' imprisonment; 40 years for the murder with an additional 25-year add-on for personally discharging a firearm. In my opinion, this discretionary sentence was not "so wholly disproportionate that it shocks the moral sense of the community."

¶ 111   I find petitioner's case analogous to *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 30, and *People v. Handy*, 2019 IL App (1st) 170213, where this court rejected defendants' attempts to

extend *Miller* via the proportionate penalties clause to young adults for crimes they personally committed.

¶ 112   In *Carrion*, 2020 IL App (1st) 171001, ¶¶ 3-4, the 19-year-old defendant entered the apartment of a 69-year-old woman and stabbed her to death. He was convicted of residential burglary and murder and sentenced to 55 years' imprisonment. *Id*. ¶ 16. Defendant sought, and was denied, leave to file a successive postconviction petition on the basis that his 55-year sentence was a *de facto* life sentence that violated the proportionate penalties clause. *Id*. ¶ 21. We affirmed, finding that his "55-year sentence for residential burglary and a senseless murder, which he committed as the principal at the legal age of adulthood, does not shock the moral sense of the community and thus is not cruel or degrading." *Id*. ¶ 30.

¶ 113   Similarly, in *Handy*, 2019 IL App (1st) 170213, ¶¶ 37, 40, the 18½-year-old defendant was sentenced to 60 years' imprisonment for home invasion, armed robbery, aggravated kidnapping, and aggravated criminal sexual assault. *Id*. ¶ 37. We rejected the defendant's *Miller* claim, explaining:

> "Whether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause. [Citations.] Here, we cannot overlook defendant's active participation where he invaded the victims' house with the codefendants, held a gun to Mr. W.'s head to prevent him from interfering while the codefendants robbed and attacked his family and kidnapped his young daughter, and then actively participated in the gang rape." *Id*. ¶ 40 (citing *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 38 (not extending *Miller* principles where the 18-year-old defendant was the perpetrator of the violent stabbing deaths of three victims); *Thomas*, 2017 IL App (1st) 142557, ¶ 34 (not extending Miller

principles where the 18-year-old defendant was the shooter and his convictions were based

on his own actions instead of accountability for the acts of another); *People v. Ybarra*, 2016

IL App (1st) 142407, ¶ 27 (not extending *Miller* principles where the 20-year-old defendant

was the one who "pulled the trigger")).

¶ 114    Although there have been recent panels of this court that have held that 18 and 19-year-old

defendants who received discretionary life sentences (*de facto* or otherwise) for murder were

entitled to raise *Miller* claims in postconviction proceedings, those cases are simply not persuasive

under the facts of this case.[1]   *Carrion* and *Handy*, and the cases cited therein are more persuasive

on the issue of discretionary sentences for young adult defendants who are personally culpable for

their crimes, particularly based on defendant's criminal history.

¶ 115    Even accepting petitioner's argument that *Miller* applies to this 19-year-old petitioner,

petitioner is not entitled to further postconviction proceedings for an as-applied challenge to his

sentence based on a consideration of his youth and specific circumstances of his life. Relevant

"youth and attendant circumstances" include, but are not limited to: "(1) the juvenile defendant's

chronological age at the time of the offense and any evidence of his particular immaturity,

impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family

---

[1]See *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 33, 59 (life without the possibility of parole imposed on the defendant who was 18 years old at the time of the murder and had no prior convictions); *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 6, 33 (natural life in prison without the possibility of parole imposed on a defendant who was 18 at the time of the murder with mental health conditions); *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 6 (discretionary natural life sentence imposed on the defendant who was 19 at time of the murder); *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 17, 18 (discretionary 40-year sentence imposed on the defendant who was 18 at time of the murder); *People v. Carrasuillo*, 2020 IL App (1st) 180534, ¶¶ 1, 11 (indeterminate sentence of 200 to 600 years' imprisonment imposed on the defendant who was 18 years old at the time of the murder with no prior record); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 2, 13 (sentence of 50 years' imprisonment imposed on a defendant who was 19 at the time of the murder with no violent criminal history or gang affiliation).

and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressure that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46.

¶ 116   Contrary to the majority's finding, petitioner had a *Miller* complaint sentencing hearing, where the trial court considered the nature of the offense, his PSI which included his social and criminal background, and, importantly, his youth. The PSI included specific information regarding petitioner's age, difficult childhood, his learning difficulties, tenth grade education, gang involvement, daily marijuana use since the age of fifteen, and history of convictions.  As we stated in *Croft*, "a key feature of the juvenile's sentencing hearing is that the defendant had the 'opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.' " (Emphasis added.) *Croft*, 2018 IL App (1st) 150043, ¶ 23 (quoting *Holman*, 2017 IL 120655, ¶ 49). *Croft* noted that the *Holman* factors are "a nonexhaustive list" and that "nothing in *Miller* or *Holman* suggests that we are free to substitute our judgment for that of the sentencing court" because the issue is not the particular sentence the trial court imposed but whether the defendant had the opportunity to present evidence regarding his youth and that the court considered his youth and its attendant characteristics in reaching its sentencing decision. *Croft*, 2018 IL App (1st) 150043, ¶¶ 32-33.  See also *People v. Chambers*, 2021 IL App (4th) 190151, ¶ 80 (quoting *Buffer*, 2019 IL 122327, ¶ 27) ("a defendant seeking relief under the *Miller* line of cases 'must show that *** the sentencing court failed to consider youth and its attendant characteristics'–a showing that, one might think, would entail more than observing that the court did not explicitly recite the *Miller* factors.").

¶ 117   In my view, even though *Miller* does not apply because petitioner was 19 at the time of the offense, the record on appeal in this case is unquestionably sufficient to decide whether his sentencing hearing complied with *Miller*. The record establishes without question that the court considered his age, social history, educational history, and criminal history in imposing a sentence that was appropriate for the brutal execution underlying his sentence.

¶ 118   For these reasons, I respectfully dissent in part from the majority's opinion.

---

**No. 1-19-2048**

---

| | |
|---|---|
| **Cite as:** | *People v. Wilson*, 2021 IL App (1st) 192048 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 07-CR-10824; the Hon. Timothy Joseph Joyce, Judge, presiding. |

---

| | |
|---|---|
| Attorneys for Appellant: | James E. Chadd, Douglas R. Hoff, Jonathan Pilsner, and Kelly Anne Burden, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| Attorneys for Appellee: | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak, Brian Levitsky, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |

---